Victor M. **FONTANE–REXACH**,
Plaintiff, Appellee,

v.

**PUERTO RICO ELECTRIC POWER AUTHORITY, et al., Defendants, Appellants.**

No. 87–1801.

United States Court of Appeals, First Circuit.

April 22, 1988.

Alice Net Carlo, Rio Piedras, P.R., with whom Wilda Rodriguez Plaza and Law Offices of Garcia Rodon, Correa Marquez & Valderas, Hato Rey, P.R., were on brief, for defendants, appellants.

Pedro Miranda Corrada, San Juan, P.R., with whom Hector Urgell Cuebas was on brief, for plaintiff, appellee.

Before TORRUELLA and SELYA, Circuit Judges, and CAFFREY,* Senior District Judge.

SELYA, Circuit Judge.

Victor M. Fontane–Rexach, plaintiff-appellee, sued under 42 U.S.C. § 1983 seeking damages, reinstatement, and ancillary relief in the aftermath of his ouster, effective May 5, 1985, as assistant chief of the supply division of the Puerto Rico Electric Power Authority (PREPA), a government agency.[1] He named as defendants the Authority, its chief executive officer (Carlos Alvarado), and its director of administration (Ramon Vicente). In his suit, plaintiff charged (1) that he was sacked because of his ties with a particular political party in derogation of his first amendment rights, and (2) that he had been denied due process. Defendants-appellants sought summary judgment. They claimed that the assistant supply chief was a "policymaker," ergo, political loyalty was an appropriate criterion for the position. The district court, in a lengthy and thoughtful opinion, denied the motion. *Fontane–Rexach v. PREPA*, Civ. No. 86–668, slip op. (D.P.R. May 29, 1987). This appeal ensued.

On an appeal of this nature, we are committed to follow the analytic modality described in *Mendez–Palou v. Rohena–Betancourt*, 813 F.2d 1255, 1257–59 (1st Cir. 1987). Our role is a severely restricted one: we consider only the isthmian question of whether the denial of partial summary judgment based on qualified immunity was proper. *Mitchell v. Forsyth*, 472 U.S. 511, 524–30, 105 S.Ct. 2806, 2814–17, 86 L.Ed.2d 411 (1985); *Vazquez Rios v. Hernandez Colon*, 819 F.2d 319, 320 (1st Cir.1987). Because of the circumscribed nature of our interlocutory review, *see Cheveras Pacheco v. Rivera Gonzalez*, 809 F.2d 125, 127 (1st Cir.1987); *Bonitz v. Fair*, 804 F.2d 164, 166–67, 175–76 (1st Cir.1986), we take no view of other matters contained in the district court's opinion. Rather, we focus at this intermediate stage of the litigation exclusively upon the nature of the position which appellee held and the question of whether, at the time, it was clearly established that one in his job capacity was protected against patronage dismissal.

### I

Although we do not find in the record incontrovertible evidence of the duties of plaintiff's position, its general parameters are not disputed. We attach as Appendix A PREPA's organization chart and as Appendix B the critical portion of the job description submitted to the court below. We proceed to gauge the post in the sometimes blurred light of *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

In *Mendez–Palou*, we set out a two-part analysis for cases involving alleged patronage dismissals. 813 F.2d at 1257–58. As the Court has instructed, we focus first on whether the position at issue relates "to partisan political interests ... [or] concerns." *Branti*, 445 U.S. at 519, 100 S.Ct. at 1295. As we said in *Mendez–Palou:*

> In making this determination we generally find it helpful to consider whether the agency employing the plaintiff handled matters potentially subject to partisan political differences and to focus upon how the plaintiff's position influenced the resolution of such matters. This step is designed to cut off from further consideration those positions involving matters devoid of partisan concerns, such as the " 'proper flow of work' in an agency," or the preferred accounting method or computer system.

813 F.2d at 1258 (citation omitted). If the state actors cannot satisfactorily answer this initial inquiry, the ball game is over.

---

* Of the District of Massachusetts, sitting by designation.

1. The formal title of Fontane–Rexach's position appears to have been "Assistant Head, Supply Division (Purchases)." The Supply Division appears on the agency's organizational chart submitted by appellants to the district court as one of six subsidiary departments of PREPA's Directorate of Administrative Services (which was, in turn, one of six such directorates). We annex the organization chart as Appendix A.

The need to take the next step—to determine whether or not the post resembles that of a policymaker, a communicator, or a privy to confidential information—will never arise. *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241–42 (1st Cir. 1986) (en banc), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987).

■ This case, we think, stumbles at the threshold. Concededly, PREPA has responsibility for matters of great public significance. The Authority was created to oversee the Commonwealth's development and utilization of water and energy resources. P.R. Laws Ann. tit. 22, § 196. Its principal mission is to ensure the delivery of electrical power to inhabitants of Puerto Rico. The agency itself likely handles "matters potentially subject to partisan political differences." *Mendez–Palou*, 813 F.2d at 1258.[2] Nevertheless, appellants are not home free. Though political affiliation may be a suitable credential for strategic leadership posts within PREPA —a matter which we leave for another day—appellee's job classification is remote from that inner circle. It is too much of a stretch, on the record now before us, to say that, as assistant supply chief, Fontane–Rexach was likely to influence politically sensitive matters.

It is important to note that plaintiff was a "staff," not a "line," officer. *See De Choudens v. Government Development Bank*, 801 F.2d 5, 8–9 (1st Cir.1986) (en banc) (discussing staff/line distinction and ramifications), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987). At that, he was not even a particularly high-ranking staffer. PREPA's bylaws provide for a nine member governing board. By-laws, Art. 2(a). They give the board power to appoint several enumerated officers, including an executive director. *Id.* at Art. 2(d), (e). The bylaws then describe in some detail two dozen positions of the next rank, *id.* at Art. 13, ranging from "director for finance" to "head, information systems," to "head, materials management" to a number of regional directors. Appellee's position is not included in this sweeping compendium. The organization chart tells much the same tale. At a bare minimum, plenipotentiaries on Fontane–Rexach's level are outranked by no fewer than thirty managers at the Authority.[3] The district court described the position as "on the fourth rung" of the PREPA hierarchy. Slip op. at 8. This characterization may well have been overly generous; at oral argument, appellants' counsel conceded that the job was "five steps down."

The proposition is made the stronger by an analysis of the duties of the position. These duties, described in Appendix B, embrace mainly what we have termed "politically neutral 'administrative' functions." *Mendez–Palou*, 813 F.2d at 1261. We neither minimize nor denigrate the value to PREPA of functions such as coordination of purchasing policies, control over the quality of supplies, administration of an appropriations budget, or oversight of the sale of excess, surplus, and obsolete goods. Yet such tasks, responsible though they may be, seem to us to "involve politically-neutral, technical, and professional matters." *De Choudens*, 801 F.2d at 9. We think a fair comparison can be drawn in this respect to our earlier decision holding that lack of political loyalty was not an

**2.** For purposes hereof, we assume that such is the case. *See, e.g., Mendez–Palou*, 813 F.2d at 1260 (holding Environmental Quality Board to be charged with "politically sensitive mission"); *id.* at 1262 (similar; Puerto Rico Aqueduct & Sewer Authority).

**3.** Unlike virtually all of the Puerto Rico governmental posts which we have held to be "unprotected" (or at least "not clearly protected") in the *Elrod–Branti* context, the assistant supply chief's job is not a "trust and confidence" (noncareer) position under the Puerto Rico Public Service Personnel Act, P.R. Laws Ann. tit. 3, §§ 1349–51. As we have said before in addressing this point, "[a]lthough we do not believe a legislature's classification system is determinative of the *Elrod–Branti* question, we do think it is entitled to some deference." *Jimenez Fuentes*, 807 F.2d at 246. The legislature's apparent decision not to place the assistant supply chief's job in the "trust and confidence" category—a category which tends to embrace (among others) those involved with politically sensitive matters —or some equivalent niche fortifies the notion that the berth lies well toward the end of the continuum where party labels seem the least befitting as employment credentials.

appropriate basis upon which to cashier a supervisor of domestic services at the governor's mansion. *Vazquez Rios,* 819 F.2d at 322–23. In that case, we pointed out—in words equally apposite here—that though the employee exercised supervisory authority, his hegemony related solely to "mundane operational [matters]." *Id.* at 322. That was not enough, even though the work was done at the seat of power, to elevate the position to one "potentially concern[ing] matters of partisan political interest." *Id.*

Appellants make two final arguments on this point. First, they say that appellee's work is "confidential" in nature, thus falling within a further *Elrod–Branti* exception. *See Vazquez Rios,* 819 F.2d at 323–26 (discussing confidentiality exception). We disagree. As with the contention that Fontane–Rexach is a "policymaker," defendants cannot reach this "second step" claim until they have demonstrated that the position relates to partisan political interests. *See Jimenez Fuentes,* 807 F.2d at 242. For the reasons we have just stated, it does not. Above and beyond that failing, nothing in the record before us illustrates that this mid-echelon bureaucrat stands in a posture of "unusually intimate propinquity relative to government leaders" sufficient to squeeze within the narrow margins of the confidentiality exception. *See Vazquez Rios,* 819 F.2d at 324. Indeed, were we to expand the scope of confidentiality in the way suggested by appellants, the exception would likely swallow up the *Elrod–Branti* rule.

Appellants also tell us that, if a political rival occupies the assistant supply chief's job, he can "obstruct" both PREPA's implementation of services and the new administration's execution of its policies. The problem with such an assertion is that it proves too much. Party membership cannot validly be equated with a propensity toward treachery; elsewise, "few jobs would be safe from the paranoia (real or feigned) of the policymakers." *Id.* at 325. As the Court has taught, "mere political association is an inadequate basis for imputing disposition to ill-willed conduct." *Elrod,* 427 U.S. at 365, 96 S.Ct. at 2685. If

the jobholder proves to be derelict in his duty (say, subversive or saboteurial), he may be removed on account of such dereliction. *See id.* at 366, 96 S.Ct. at 2686 ("employees may always be discharged for good cause, such as insubordination or poor job performance"). The mere suspicion that political differences might lead to future dereliction, however, will not do. "Lack of political affiliation (or possession of the 'wrong' political affiliation) cannot automatically be read to imply untrustworthiness." *Vazquez Rios,* 819 F.2d at 325.

We summarize this portion of our opinion. On the present record, the assistant supply chief seems rather obviously to be "a staff official who ... is both empowered and constrained by the limits of [his] specialized functions." *De Choudens,* 801 F.2d at 9. The position, though admittedly a necessary one for PREPA's operations and to facilitate the work flow of the Authority, appears bereft of partisan concerns. Although supply officers will not always approach matters in a uniform way—they may have divergent ideas about which paper clips should be bought, or which inventory items declared obsolete, or how best to contract for services—it is improbable that such differences will involve partisan political concerns. Hence, such a disagreement, even if it came about, would not be "the sort of 'policy' dispute recognized as relevant" by the *Elrod–Branti* thesis. *Mendez–Palou,* 813 F.2d at 1258. In the same vein, the assistant supply chief's policy-implementing responsibilities arise far down the ladder and are characterized by their politically neutral dimension. We conclude, therefore, that party affiliation is not an appropriate requirement for the effective performance of the assistant supply chief's job.

## II

■ There is, however, yet another leg to the race. Where (as here) the issue is qualified immunity, the bottom-line query is not whether a particular public employee falls within or without the *Elrod–Branti* realm, but whether, at the time the adverse employment decision was undertaken, "it

was clearly established that employees in the *particular positions* at issue, in light of the responsibilities inherent in those positions, were protected from patronage dismissal." *Mendez–Palou,* 813 F.2d at 1259 (emphasis in original). If not, qualified immunity applies, *e.g., Bonilla v. Nazario,* 843 F.2d 34, 36–37 (1st Cir.1988); *Nunez v. Izquierdo–Mora,* 834 F.2d 19, 21 (1st Cir. 1987) (per curiam); *Juarbe–Angueira v. Arias,* 831 F.2d 11, 14 (1st Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1222, 99 L.Ed.2d 423 (1988), and the state actor/defendants are entitled to partial summary judgment immunizing them against claims for money damages.

Against this backdrop, we consider whether or not, in May 1985, plaintiff's right to hold his job free of a politically-motivated firing was "clearly established." In examining this question, we focus not on what the defendants may or may not have known, but on the legal reasonableness of their actions, viewed objectively. *Harlow v. Fitzgerald,* 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). That is to say, for appellee to wrest the mantle of qualified immunity from his superiors' shoulders, the contours of his right to keep his job separate from his politics must have been sufficiently plain, on the date of the discharge, that reasonable officials in appellants' shoes would have understood that cashiering Fontane–Rexach violated that right. *Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987); *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986).

Although this particular position had not been the subject of litigation prior to 1985, we believe that the basic principles which render the office a protected one "were part and parcel of *Elrod* and *Branti,* and were manifestly evident in the doctrinal underpinnings of the general rule concerning when—and under what circumstances

—pure patronage dismissals might or might not be justifiable." *Vazquez Rios,* 819 F.2d at 326. Even as early as May 1985, if *Elrod–Branti* were thought to have any meaning, reason strongly suggested that the prophylaxis of the rule would envelop one in appellee's shoes. *See, e.g., Grossart v. Dinaso,* 758 F.2d 1221 (7th Cir.1985) (township's bookkeeper, whose duties included oversight of municipal purchasing, could not be dismissed for political considerations); *De La Cruz v. Pruitt,* 590 F.Supp. 1296 (N.D.Ind.1984) (audit supervisor's position did not implicate partisan political concerns); *Barnes v. Bosley,* 568 F.Supp. 1406, 1411–13 (E.D.Mo. 1983) (political affiliation not an appropriate requirement for retention of unit managers, though they "could be considered high level managers and supervisors with responsibility over a large number of people"), *aff'd in relevant part, rev'd in part,* 745 F.2d 501 (8th Cir.1984), *cert. denied,* 471 U.S. 1017, 105 S.Ct. 2022, 85 L.Ed.2d 303 (1985). *Cf. Colon v. CRUV,* 84 J.T.S. 52 (1984) (explicating views of Supreme Court of Puerto Rico); *Ramos Villanueva v. Secretario de Comercio,* 112 D.P.R. 514 (1982) (similar).[4] All of these cases, we hasten to add, were decided prior to appellee's ouster as assistant supply chief.

On this record, we doubt that appellants can legitimately claim to have been objectively reasonable in thinking that Fontane–Rexach could lawfully be discharged because of his political leanings. After all, from near the inception of this specie of first amendment jurisprudence, "the law seem[ed] clear at either end of the *Elrod–Branti* spectrum." *Mendez–Palou,* 813 F.2d at 1258 (quoting *De Abadia v. Izquierdo Mora,* 792 F.2d 1187, 1194 (1st Cir.1986) (Campbell, C.J. concurring)). It strains credulity to regard the position at issue as being much distant from the nonpolitical pole.

---

**4.** We have consistently held, and today reaffirm, that decisions of the commonwealth's courts are not controlling as to the qualified immunity question in cases such as this. *See, e.g., Rodriguez Rodriguez v. Munoz Munoz,* 808 F.2d 138, 141–42 (1st Cir.1986). Simply put, the qualified immunity inquiry asks whether a state actor should have known, when he dismissed an underling, that clearly established *federal* law contravened his actions. *See id.* at 142. Nevertheless, such decisions may "be considered for their persuasive effect" in connection with framing intelligent responses to the qualified immunity inquiry. *Id.*

In arguing to the contrary, appellants place considerable reliance on *Juarbe-Angueira*, where we observed that, "for the most part, in early 1985, the law did not *clearly* forbid dismissals of those in 'upper level' managerial-type government positions [because of political ties]." 831 F.2d at 13 (emphasis in original). We went on to say that "defendants will normally enjoy qualified immunity from damage liability in upper level managerial-type job dismissal cases, cases where the jobs in question are not purely technical or scientific in nature." *Id.* at 14. We find defendants' reliance on these generalities to be sorely mislaid. In the first place, it is difficult to envision plaintiff's fifth echelon post as an "upper level" managerial slot. In the second place, the technical aspects of the work dominate the job description—moreso than in the case of, say, a regional director (who is, in his own bailiwick, "the alter ego of the [head of the agency] at the regional level." *Jimenez Fuentes*, 807 F.2d at 245). Third—and perhaps most telling—"normally" does not, as appellants seem to suggest, mean "inevitably;" "for the most part" may mean "often"—but it does not mean "always." There are obviously exceptions—and plaintiff's position at PREPA, with its heavy emphasis on administrative and professional skills and on work flow, lends itself readily to a powerful argument that it should have been regarded, all along, as a politically neutral berth. *Cf. Nunez*, 834 F.2d at 23 (distinguishing, for qualified immunity purposes,

deChoudens's position with the Government Development Bank from Nunez's position with the Health Facilities and Services Administration).[5]

In sum, we are satisfied that in May 1985 the law was sufficiently "clearly established" that a mid-level deskbound job such as this, replete with administrative tasks of a quintessentially nonpartisan nature, was not suitable grist for the political mill. Accordingly, appellants cannot be said as a matter of law to have been shielded by qualified immunity.

### III

■ We need go no further. On the existing record, it appears that here, as in *De Choudens*, the functions of plaintiff's office "are so remote from advancing or thwarting the agency's partisan-responsive goals that political affiliation would not be considered an appropriate requirement." 801 F.2d at 6. Moreover, this mid-echelon job classification was at such a remove from the political arena that defendants, had they been objectively reasonable, should have realized that Fontane-Rexach enjoyed safe harbor under *Elrod-Branti*. Their decision to ignore these clear portents was undertaken at their legal peril. The district court did not err in refusing to grant *brevis* disposition in favor of appellants on grounds of qualified immunity.[6]

*Affirmed.*

---

5. The basic problem, of course, is the defense's hope that, at least in this time frame, *all* managerial jobs were outside the *Elrod-Branti* sphere. Indeed, at oral argument, appellants' counsel, when asked to name a single "upper level managerial-type government position" where the Constitution in early 1985 clearly forbade political reprisal firings, could identify none.

6. The defendants, of course, remain free to attempt to produce at trial additional evidence to show that—somehow, some way—political affiliation is a suitable criterion for this post. *See Vazquez Rios*, 819 F.2d at 329.

APPENDIX A

PUERTO RICO ELECTRIC POWER AUTHORITY

APPENDIX B

EXHIBIT 3

CODE OF THE CLASS 0-1196

SALARY GROUP E-III

ASSISTANT HEAD, SUPPLY DIVISION (PURCHASES)

*Functions and Responsibilities of the Job:*

This is administrative work at an executive level which comprises the formulation of norms, guidelines and the planning, organization, direction, coordination and supervision of all purchasing activities of the Authority. The official in this class is responsible for the acquisition, availability and quality of all the materials, equipment and supplies needed at the Authority to carry out its programs. He performs his duties under general supervision and exercises a high degree of initiative and self judgment. The work is evaluated through verbal and written reports submitted to the Head, Supplies Division.

*Illustrative Examples of the Job:*

Plans, directs, coordinates and supervises all the purchasing activities.

Formulates and recommends the implementation of norms and procedures to improve the internal operations of the purchasing area of the Division.

Is responsible for the publication, review, evaluation, approval and adjudication of bids.

Negotiates the contracting of services.

Evaluates the quality of the products, materials and equipment which the Authority acquires.

Determines conditions and value of excess and surplus supplies to be sold by the Authority.

Is responsible for the sale of obsolete material.

Coordinates with the different suppliers of materials and equipments the services related to purchases which these render to the Authority.

* Of the District of Massachusetts, sitting by desig-

Coordinates the rendering of the services mentioned with officers of the Authority and governmental agencies, as required.

Recommends and administrates the annual operational budget of the Purchasing area.

Executes related tasks which are required.