Carlos R. BERRIOS–CINTRON, Plaintiff,

v.

Miguel A. CORDERO, individually and as Executive Director of the Puerto Rico Electric Power Authority, the Puerto Rico Electric Power Authority, Defendants.

Civil No. 93–1887CCC.

United States District Court, D. Puerto Rico.

Aug. 27, 1997.

Carlos A. del–Valle, Mayaguez, PR, for plaintiff.

Roberto A. Fernandez, PR, for defendants.

## ORDER

CEREZO, Chief Judge.

This is a political discrimination civil rights action, brought under 42 U.S.C. sec. 1983 by plaintiff Carlos R. Berrios–Cintrón (hereinafter "Berrios") against Puerto Rico Electric Power Authority (hereinafter "PREPA") and its Executive Director, Mr. Miguel A. Cordero (hereinafter "Cordero").[1] Berrios also asserts a cause of action under the laws of Puerto Rico,[2] specifically under Law No. 382 of May 11, 1950, 29 L.P.R.A. sec. 136 *et seq.;* Law No. 100 of June 30, 1959, 29 L.P.R.A. sec. 146 *et seq.;* and Law No. 5 of October 14, 1975, as amended, 3 L.P.R.A. sec. 1331 *et seq.*[3]

---

1. As a quasi-public corporation, *see* P.R. Laws Ann. tit. 22, sec. 193 (1987), PREPA can sue and be sued, *id.* sec. 196(e). PREPA is not a branch of the Commonwealth Government and as such is not covered by the protection of the Eleventh Amendment to the Constitution of the United States. *Riefkohl v. Alvarado,* 749 F.Supp. 374 (D.Puerto Rico 1990).

2. The doctrine of pendent jurisdiction authorizes, although it does not require, a federal court to hear a claim that has no independent basis for federal jurisdiction, if the claim derives from a "common nucleus of operative fact" with a federal claim that is substantively sufficient to confer subject matter Jurisdiction on the court. *United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Although *Gibbs* has been superseded by 28 U.S.C. sec. 1367, the conditions and limitations statutorily created do not affect the exercise of pendent jurisdiction in this particular case.

3. Plaintiff mentioned Law. No. 114 of May 7, 1942, 29 L.P.R.A. sec. 140 *et seq.* as part of his cause of action. That section, however, imposes criminal penalties on defendants who commit political discrimination. It is improper for plaintiff to seek criminal penalties through the civil litigation system. The correct procedure in the criminal sphere is to allow law enforcement and prosecutorial authorities to fulfill their functions.

On January of 1993, Cordero, a member of the New Progressive Party (hereinafter "NPP"), was appointed Executive Director of PREPA. Cordero appointed Juan Almeyda (hereinafter "Almeyda"), also a member of the NPP, as Director of the Electrical Systems Directorate. Almeyda is an active member of the NPP, having acted as president of a PREPA employee association favoring statehood, having been a member of the NPP transition committee after the 1992 elections, and whose name was mentioned as a candidate for the position of Executive Director of PREPA. Plaintiff works in the Electrical Systems Directorate under Almeyda.

▪ Defendant Cordero claims that under the new administration PREPA had to face the fact that the availability of electricity was very low. He informed his staff, Including Almeyda, that the problems needed to be addressed. As a result of Cordero's mandate, it is claimed that Almeyda decided to change some of his personnel and that plaintiff Berrios, a member of the Popular Democratic Party (hereinafter "PDP"), had to be removed from his position as Assistant Head (or Chief) of the Maintenance (or Conservation) Division in favor of a more experienced Jorge Timote (hereinafter "Timote"), who is a member of the NPP. Plaintiff was removed from his post on February 28, 1993 and reinstated to his previous position as Project Administrator. Defendants contend that the change of position was due to the fact that Timote was more qualified to implement Cordero's policy under the new administration than plaintiff. Plaintiff counters that the change in position was politically motivated in violation of his freedom of association and of expression, protected by the First and Fourteenth Amendments to the Constitution of the United States.[4] He seeks damages and reinstatement as Assistant Head of the Maintenance Division. Before us are defendants' motion for summary judgment (**docket**

entry 24) and plaintiff's counter-motion for summary judgment (**docket entry 30**).

## I. Defendants PREPA and Cordero's Motions for Summary Judgment

The defendants' Motions for Summary Judgment require discussion of the qualified immunity defense (only as to Cordero), the *Elrod–Branti* exception and the change over defense.

The Supreme Court has held that qualified immunity will be granted to those government officials who are performing discretionary functions, as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Id.* Officials will be immune unless "the law clearly proscribed the actions" they engaged in which gave rise to the cause of action. *Davis v. Scherer,* 468 U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984). Thus qualified immunity will protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs,* 475 U.S. 335, 344–345, 106 S.Ct. 1092, 1097–1098, 89 L.Ed.2d 271 (1986). Whether qualified immunity will protect an official from being held personally liable will depend on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time the illegal action took place. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982).

"In order to conclude that the right which the official allegedly violated is 'clearly established,' the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 635–37, 107 S.Ct. 3034, 3036–37, 97 L.Ed.2d 523 (1987). The First Circuit defined the term 'clearly established' as follows:

4. Plaintiff mentions in passing that his Fifth Amendment rights were violated as well. "[P]laintiff never clearly identified the property right(s) which he was allegedly deprived of. Nor did he attempt (1) to identify the source of any such right or rights; (2) to explain how the right or rights are entitled to constitutional protection; (3) to specify the facts which allegedly support

his due process claim; or (4) to cite any legal authority tending to strengthen his claim. In light of these omissions, it is apparent that plaintiff presented his due process claim to the district court in only a most perfunctory manner." *Rodríguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 41 (1st Cir.1993). As such, the claim shall not be entertained by this Court.

We consider it to be something less than requiring the public official to show that the principle of law did not exist, or there would be little left; there would be few cases on which officials could succeed. Only rarely do legislatures or courts introduce or change whole principles. More often, the process of change involves a sharpening of lines in the law's gray areas, absent which there could reasonably be excusable mistakes. The case law supports this broad interpretation. *de Abadia v. Izquierdo Mora,* 792 F.2d 1187, 1190–1191 (1st Cir.1986).

"[T]he [Supreme] Court laid heavy emphasis on the officials' good faith, now defined by *Harlow* as objective good faith, as the criterion by which their actions are to be judged. ... The good faith standard is the Court's attempt to accommodate this need for discretionary action in areas of uncertainty with the protection of individual rights." *Id.* "The official cannot be expected to predict the future course of constitutional law, but he will not be shielded from liability if he acts 'with such disregard of ... clearly established rights that his action[s] cannot reasonably be characterized as being in good faith.'" *Procunier v. Navarette,* 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978) (quoting *Wood v. Strickland,* 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975)) (citations omitted).

The question is not whether defendants were in fact correct in believing party affiliation to be an appropriate requirement for plaintiff's position, but whether viewed objectively, they acted reasonably in so believing. "If this were an issue of subjective good faith, there might always be a question of fact; it is difficult to think there could ever be a summary judgment. However, in the case of objective good faith, that a reasonable man in defendants' position could have believed his conduct to be warranted, ... may be a purely legal question." *de Abadia,* 792 F.2d at 1191.

The level of generality at which the 'clearly established' standard is applied can be dispositive. The Fourth or Fifth Amendments, for example, are both clearly established. They mandate certain safeguards and protections. "[T]he right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause violates a clearly established right." *Anderson,* 483 U.S. at 639, 107 S.Ct. at 3039. However, "if the test of 'clearly established law' were to be applied at this level of generality, it would bear no relationship to the 'objective legal reasonableness' that is the touchstone of *Harlow.*" *Id.* "*Harlow* would be transformed from a guarantee of immunity into a rule of pleading," destroying the balance which the Supreme Court has reached between the interest to vindicate illegal actions by public officials against citizens' constitutional rights and public officials' effective performance of their duties. *Id.* The Court has obtained this balance by emphasizing the importance of public officials being able to reasonably anticipate when their conduct may give rise to liability for damages. *Id.*

We shall first analyze the status of the caselaw on political discrimination at the time. After doing so, we shall determine whether Cordero is entitled to qualified immunity and whether both defendants can benefit from the *Elrod–Branti* exception and/or the changeover defense.

**First Amendment Protection against Political Discrimination**

In 1976 the Supreme Court of the United States began what, in retrospect, can be described as an ongoing process geared towards identifying and defining instances of political discrimination. Patronage dismissal was not regarded as a violation of the Federal Constitution until *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). These two cases "marked a substantial change in the law." *de Abadia,* 792 F.2d at 1191. They were to make clear the fact that "[t]he First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or not to believe and not to associate" with particular political entities. *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 76, 110 S.Ct. 2729, 2738, 111 L.Ed.2d 52 (1990).

*Elrod* was the first case to hold that "public employees who allege[ ] that they were discharged due to their political affiliation [can] state a claim for violation of their first and fourteenth amendment rights. 427 U.S. at 373, 96 S.Ct. at 2689." *Méndez–Palou v. Rohena–Betancourt*, 813 F.2d 1255, 1257 (1st Cir.1987). It determined that a dismissal based on an employee's failure to support a political party clearly infringes first amendment freedoms of belief and association. *Elrod*, 427 U.S. at 359–60, 96 S.Ct. at 2682–83.

In a political discrimination case, the plaintiff must show that political animus was a substantial or motivating factor for the adverse employment action. If plaintiff meets that burden, the burden shifts to the defendants to establish that there was a non-discriminatory reason for the dismissal. *Ferrer v. Zayas*, 914 F.2d 309, 311 (1st Cir. 1990). Finally, defendants can also escape liability if they can show that they fall under the *Elrod–Branti* exception.

**The *Elrod–Branti* Exception**

The protection which *Elrod* provides for employees dismissed because of their political affiliation is not absolute. "[R]epresentative government needs a certain amount of leeway for partisan selection of agents in order to work. ... In order for the new administration to be given an opportunity to fulfill expectations, it must have available and also appear to have available significant facilitators of policy, people who have the personal and partisan loyalty, initiative, and enthusiasm that can make the difference between the acclaimed success of a government agency or program and its failure or, more typically, its lackluster performance. The presence of such persons advances the goals of representative government; their absence, in *Elrod's* term, 'undercut[s]' such government." *Jiménez Fuentes v. Torres Gaztambide*, 807 F.2d 236, 241 (1st Cir.1986).

"The conditioning of public employment on political affiliation could survive constitutional challenge only if it furthered a vital governmental interest by a means least restrictive of first amendment freedoms." *Id.* at 239. The Court realized that it was necessary to allow for some politically motivated dismissal of public employees, "noting that the [F]irst [A]mendment must yield to the vital interest of preserving representative government whenever elected officials choose to replace underlings employed in 'policy-making' or 'confidential' positions. *See Elrod*, 427 U.S. at 367, 96 S.Ct. at 2687; *id.* at 375, 96 S.Ct. at 2690 (Stewart, J., concurring)." *Mńdez–Palou*, 813 F.2d at 1257. Consistent with *Elrod, Branti* held that "the ultimate inquiry ... is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518, 100 S.Ct. at 1295.

■ In deciding *Jiménez Fuentes v. Torres Gaztambide,* the First Circuit established a two-step approach aimed at facilitating the task of determining when 'party affiliation is an appropriate requirement for the effective performance of the public office involved.' The First Circuit has since begun to "employ the [ ] test to demarcate the boundary of first amendment protection from politically motivated discharge. *See Jiménez Fuentes v. Torres Gaztambide*, 803 F.2d 1, 5–6 (1st Cir. 1986) (en banc) (collecting cases)." *Méndez–Palou*, 813 F.2d at 1257.

The first step in the *Jiménez Fuentes* approach is to ask "whether the position at issue, no matter how policy-influencing or confidential it may be, relates to 'partisan political interests ... [or] concerns.'" *Jiménez Fuentes*, 803 F.2d at 6 (quoting *Branti*, 445 U.S. at 519, 100 S.Ct. at 1295, 63 L.Ed.2d 574). The second step of the *Jiménez Fuentes* test is to determine whether the post resembles that of a policymaker, a communicator, or a privy to confidential information. *Id.*

The first step asks whether the position in question relates to partisan political interests or concerns. *Id.* "[This] step [of the *Jiménez Fuentes* test] is designed to cut off from further consideration those positions involving matters devoid of partisan concerns, such as the ... preferred accounting method or computer system. ... We further note that, for a position to pass the first threshold, there need not exist presently a political disagreement over the proper role of govern-

ment in the particular area of governance at issue. The position at issue need only involve 'decisionmaking on issues where there is room for political disagreement on goals or their implementation.'" *Méndez–Palou,* 813 F.2d at 1258.

For a position to fall under the *Elrod–Branti* exception, the *Jiménez Fuentes* test must be met in its entirety. If this first step is not met, the inquiry ends.

Early on our Court of Appeals cautioned not to maintain "an unduly myopic view of the role of politics in the seemingly apolitical context of universal provision of services." *Roman–Meléndez v. Inclan,* 826 F.2d 130, 133 (1st Cir.1987), (quoting *Tomczak v. City of Chicago,* 765 F.2d 633 (7th Cir.1985)). Elections often turn on the success or failure of the incumbent to provide these services, and, as campaigns develop, the opposing sides put forth varying proposals on how best to provide services. While the ultimate goal may be the same, there is clearly room for principled disagreement in the development and implementation of plans to achieve that goal. Previous decisions of the Court of Appeals have found the need for political affiliation, at least potentially, even in positions carrying no indicia of partisan politics, such as that of a zone fire chief. *See Figueroa–Rodríguez v. López–Rivera,* 878 F.2d 1478 (1st Cir.1989).

"Concededly, PREPA has responsibility for matters of great public significance. The Authority was created to oversee the Commonwealth's development and utilization of water and energy resources. P.R. Laws Ann. tit. 22, sec. 196. Its principal mission is to ensure the delivery of electrical power to inhabitants of Puerto Rico. The agency itself likely handles 'matters potentially subject to partisan political differences.'" *Fontane–Rexach v. PREPA,* 878 F.2d 1493, 1495 (1st Cir.1988). "The Authority is created for the purpose of conserving, developing, and utilizing, and aiding in the conservation, development, and utilization of water and energy resources of Puerto Rico, for the purpose of making available to the inhabitants of the Commonwealth, in the widest economic manner, the benefits thereof, and by this means to promote the general welfare and increase

commerce and prosperity; and the Authority is granted and shall have and may exercise all rights and powers necessary or convenient for the carrying out of the aforesaid purposes ..." P.R. Laws Ann. tit. 22, sec. 196; *Rodríguez–Burgos v. Electric Energy Authority,* 853 F.2d 31, 35 (1st Cir.1988). "That PREPA is engaged in what might be termed a 'politically sensitive mission,' seems to us self evident." *Id.*

■ The first prong of the *Jiménez Fuentes* test is not met unless **plaintiff's particular position within PREPA** is politically sensitive. *Fontane–Rexach,* 878 F.2d at 1495. In *Fontane–Rexach* the position in question was the Assistant Head of the Supply Division. The First Circuit found that this position was not politically sensitive enough to meet the first prong of the *Jiménez Fuentes* test. The Court stated that the duties of the Assistant Head of the Supply Division, "embrace mainly what we have termed 'politically neutral **administrative** functions.'" *Fontane–Rexach,* 878 F.2d at 1495 (emphasis added).

The position in controversy in this case is Assistant Head of the Maintenance Division, which is an equally ranked position within PREPA to that of Fontane–Rexach, albeit in a different division. Both positions have the same number of superiors, both are fourth, or perhaps even fifth tier jobs, within PREPA. *Id.*

The job description for Berrios' position clearly states that "[t]his is executive work of a **technical and administrative nature**...." The similarities between the positions of Fontane–Rexach and that of plaintiff Berrios, and plaintiff's own job description, lead us to conclude, in accordance with the First Circuit's previous rulings, that defendants have not satisfied the first prong of the *Jiménez Fuentes* test. "[I]t strains credulity to regard the position at issue as being much distant from the non-political pole." *Fontane–Rexach,* 878 F.2d at 1497.

■ Although failure to meet the first step of the *Jiménez Fuentes* test is enough for the test in its entirety to have been failed, it is important for our subsequent qualified im-

munity analysis to determine whether the second prong of the test was met.

At that stage one looks at plaintiff's specific employment responsibilities "to determine whether [the position involved] resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement ... [focusing on the] powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office." *Jiménez Fuentes,* 803 F.2d at 6. "[T]he actual past duties of the discharged employee are irrelevant if the position inherently encompasses more expansive powers and more important functions that would tend to make political affiliation an appropriate requirement for effective performance." *Méndez–Palou,* 813 F.2d at 1258.

*Jiménez Fuentes* and *de Abadia* citing *Ecker v. Cohalan,* 542 F.Supp. 896, 901 (E.D.N.Y.1982), assets in making the distinction between policymaking and technical employment by providing guidelines or indicators, such as: 1) relative pay, 2) technical competence, 3) power to control others, 4) authority to speak in the name of policymakers, 5) public perception, 6) contact with elected officials, 7) responsiveness to partisan politics and political leaders, and 8) responsibilities that are not well defined or are of broad scope.

After looking at the job description for the Assistant Head of the Maintenance Division and comparing it to the job description of Fontane–Rexach's prior position as Assistant Head of the Supply Division, it seems clear that the second step of the *Jiménez Fuentes* test has not been met either. In *Fontane–Rexach,* focused mainly on the job description, the Court held that the position of Assistant Head of the Supply Division did **not** reach the necessary threshold for the position to be encompassed within the *Elrod–Branti* exception, and that therefore dismissal based on political affiliation was wrong. *Figueroa–Rodríguez v. López–Rivera* (reviewing *Fontane–Rexach* ) states the following: "A panel of this court found that the record indicated this position was highly technical in terms of its duties, and not very

high level in respect to organizational rank." *Figueroa–Rodríguez,* 878 F.2d at 1485. Such is the case with the Berrios' position. The following is the job description of Berrios' previous position as Assistant Head of the Maintenance Division:

### Duties and Responsibilities of the Job

This is executive work of a **technical and administrative nature** that consists in helping the Head of the Electrical Systems Maintenance Division in the programming and direction of the maintenance and repair of the generators and other equipment of the electrical power plants. The officer in this class is responsible for the continuity, efficiency and quality of the electrical service through the effective planning of the conservation and maintenance tasks and programs and the maintenance of the primary power production equipment. The incumbent exercises the duties with a high degree of discretion and self judgment and the work is evaluated through conferences and reports submitted by the Head of the Electrical Services Maintenance Division.

### Illustrative Examples of the Work

1. He/She is responsible, to the Head, Electrical System Maintenance Division, for the maintenance, repair and rehabilitation schedules of the power plants, boilers, turbines, generators and auxiliaries.

2. Establishes standards and procedures, and directs the administration of personnel within the Subdivision; coordinates said standards within the Division.

3. Supervises, in coordination with the General Superintendents of the Thermal Power Plants and the Supervisors of the Hydroelectric Power Plants, preventive maintenance schedules for the power plant equipment.

4. Resolves technical problems related to the maintenance of the equipment in different generation stations.

5. Recommends budgets and goals of the programs for the Subdivision.

6. Directs the preparation of the maintenance programs and coordinates with the Personnel Division effective training programs for subordinates.

7. Is responsible for the establishment of effective safety rules, and recommends revisions and improvements to said rules.

8. Coordinates with the Engineering and Construction Division, constructions and tests of new generation units and their auxiliary equipment.

9. Meets with consultant engineers to coordinate the work that will be performed at the stations and with suppliers to observe equipment demonstrations.

10. Executes related tasks that may be required.

As in *Figueroa–Rodríguez v. López–Rivera* and *Fontane–Rexach,* this Court finds that the job description of Berrios' previous position reflects that it is technical and administrative in nature, not a policymaking position.

Having failed steps one and two of the *Jiménez Fuentes* test, plaintiff does not fall under the *Elrod–Branti* exception to the general rule prohibiting politically motivated dismissals or demotions. This decision, however, does not preclude defendants from "attempt(ing) to produce at trial additional evidence to show that—somehow, some way—political affiliation is a suitable criterion for this post." *Fontane–Rexach,* 878 F.2d at 1498, n. 6 (quoting *Vázquez Ríos v. Hernández Colón,* 819 F.2d 319, 329 (1st Cir.1987)).

**The Changeover Defense**

■ There is a lesser known defense which defendants invoke called the 'changeover defense' which "refers to a new administration's claim that challenged actions taken reasonably soon after the 'changeover' in power were designed to advance its First Amendment-related interest in implementing its policies." *Agosto–de–Feliciano v. Aponte–Roque,* 889 F.2d 1209, 1220 (1st Cir. 1989).[5] There are two (2) aspects of the changeover defense which must be addressed.

The first aspect deals with the expected changes early into a new administration's tenure of governance.

In order to best accomplish its policy goals, a new administration may substantially reorganize the structure of one or more departments, it may readjust departmental priorities, or it may initiate early new procedures for carrying out its functions. The changeover in government is thus likely to produce substantial alterations in certain employee's jobs not because those employees are members of the outgoing party but because the incoming party, as a matter of policy, does not view those jobs to be important. We believe an incoming administration must be given ample room to effect this sort of change without the fear of triggering a multitude of lawsuits by employees whose jobs have changed. Therefore, we believe the factfinder should give some deference to a new government's explanation of how changes made shortly after it assumed power fit into its overall policy objectives.

*Id.* at 1221.

The previous passage mentions readjustments in 'departmental priorities.' In the case at bar there was a change in PREPA's priorities, changing the agency's focus from the availability of electricity to the maintenance of the generation units. However, the passage also states that changes in employees' positions must be the result of a change in priority in terms of the importance given to the position itself and not to those occupying the positions. In other words, this defense is available to governments which restructure their way of conducting business so as to make it impractical to maintain an employee's position no longer practical to maintain in its present form. To apply the defense to situations in which there is a simple change in priorities, such as here, would allow new administrations to circum-

**5.** "There is some question as to the continuing vitality of *Agosto–de–Feliciano* in light of the Supreme Court's ruling in *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)." *Rivera–Ruiz v. Gonzalez–Rivera,* 983 F.2d 332 (1st Cir.1993). The questions surrounding the case, however, deal with *Agosto–de–Feliciano's* more restrictive approach than *Rutan's* as to what actions short of dismiss-

al constitute a violation of the First Amendment. In the case at bar the debate surrounding *Agosto–de–Feliciano* is moot, for the actions taken against Berrios, if determined to be politically motivated, meet the requirements of both *Agosto–de–Feliciano* and *Rutan.* As to the issues in which the Court follows *Agosto–de–Feliciano,* the case provides us with a legally valid and viable approach.

vent the protections of the First Amendment and to do away with members of outgoing parties under the guise of a change in 'policy.'

The second aspect of the changeover defense is a variant of yet another defense, called the *Mt. Healthy* defense. *Mt. Healthy City Board of Education v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).[6] "[T]his prong assumes that the new administration may, at times, feel the need to assign duties deemed especially critical to its political philosophy to employees who share that philosophy.... This shift in duties based on political affiliation could be proper **where the employer can show a reasonable basis for believing** that such an employee would likely be more helpful in implementing the new policies than an employee who is a member of an opposing political party." *Agosto–de–Feliciano,* 889 F.2d at 1221 (emphasis added). To be able to use this defense, a defendant must show that the changes he made were motivated by a strategy in performing his duties, instead of motivated by political favoritism.[7] Defendants have presented no proof to establish reasonable basis for believing that Berrios' affiliation with the PDP, or his belief in maintenance over availability of electricity for that matter, impedes the performance of his duties in any way. The difference in philosophy does not meet the necessary burden for this aspect of the changeover defense to be available to the defendants in the case at bar.

Having concluded that the *Elrod–Branti* exception does not apply to the defendants and having found that they do not comply with either aspect of the changeover defense, **defendant PREPA's motion for summary judgment based on the *Elrod–Branti* exception and on the changeover defense is DENIED.**

**Application of the Qualified Immunity Defense**

■ Defendant Cordero cannot obtain summary judgment through the *Elrod–Branti* exception or the changeover defense. Unlike PREPA, however, we must still determine whether he is entitled to qualified immunity.

The Court finds that there are two ways for defendant Cordero to be entitled to qualified immunity. The first is for both steps of the *Jiménez Fuentes* test to be unclear, which poses the typical qualified immunity scenario. The second deals with the situation when one of the prongs of the *Jiménez Fuentes* test is clearly established and the other is not.

The Court must determine which are the clear legal concepts of political discrimination in deciding whether Cordero is entitled to qualified immunity. It must determine the clearness of the *Jiménez Fuentes* test as applied to this case.

*Fontane–Rexach* specifically determined the status of a position within PREPA very similar to that of the plaintiff Berrios. The job descriptions of Berrios and Fontane–Rexach's prior positions are very similar in terms of responsibilities and rank. Both descriptions project an image of administrative and technical focus on the positions. Fontane–Rexach was dismissed by PREPA from

---

6. The *Mt. Healthy* defense states that an employer can overcome a showing by the employee of politically motivated dismissal or demotion as long as he/she can show, by a preponderance of the evidence, that he/she would have dismissed the employee regardless of his/her political affiliation. It is usually phrased as a "but for" question: Would the plaintiff have been dismissed/demoted notwithstanding his/her political affiliation? If the interrogatory is answered in the affirmative, the 'but for' test has been met by the employer (or failed by the employee), and the dismissal/demotion is not violative of the First Amendment. *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Rosaly v. Ignacio,* 593 F.2d 145, 149 (1st Cir.1979); *De Choudens v. Government Development Bank,* 801

F.2d 5, 7 (1st Cir.1986). Defendant's burden has not been met in the case at bar, and thus the *Mt. Healthy* defense does not apply.

7. In determining whether the changeover defense is available to defendants, the factfinder should consider whether the dismissal or demotion occurred precipitately or after some opportunity for appraisal. "[C]hanges made within days of new administration's ascent to power ordinarily more likely to demonstrate improper political 'housecleaning' than changes made months later, after new officials had sufficient opportunity to effectively evaluate reorganization of departments." *Acevedo Cordero v. Cordero Santiago,* 764 F.Supp. 702 (D.Puerto Rico 1991).

his position as Assistant Head of the Supply Division. This position has the same hierarchical level as that of plaintiff Berrios. The fact that both cases name PREPA as defendant and that the positions are so similar lead us to conclude that the 1988 *Fontane–Rexach* decision created a 'clearly established' legal standard for agency head Cordero to follow in 1993. As stated, *Fontane–Rexach* clearly held that the position of Assistant Head of the Supply Division did not reach the threshold necessary for the position to be encompassed within the *Elrod–Branti* exception, and that dismissal based on political affiliation was wrong.

We have, nonetheless, looked at the job description and used the eight (8) guidelines which the First Circuit borrowed from Judge Weinstein's opinion in *Ecker v. Cohalan* in further analysis of the qualified immunity issue. "[T]he record in these political discharge cases often contains an undisputed Job Classification Questionnaire or other job description that outlines the functions of the particular position at issue. Whenever possible, we will rely upon this document because it contains precisely the information we need concerning the position's inherent powers and responsibilities to address the issue of qualified immunity." *Méndez–Palou,* 813 F.2d at 1260.

The Court has previously determined that defendants have not satisfied the second prong of the *Jiménez Fuentes* test. The facts needed to make this determination, mainly the Job description, are undisputed.

As we have discussed before, failure to meet either of the prongs of the *Jiménez Fuentes* test results in failing the test as a whole. Cordero should have known that he had not met the *Elrod–Branti* exception in this action due to his failure to satisfy the second prong of the *Jiménez Fuentes* test, which was clearly established. This being the case, it is impossible for Cordero to argue that his actions were motivated by a good faith belief that Berrios' position was encompassed within the *Elrod–Branti* exception. For this reason, defendant Cordero is not entitled to qualified immunity.

For the reasons discussed above, defendants' Motion for Summary Judgment (**docket entry 24**) is DENIED.

Having carefully considered plaintiff's Motion for Summary Judgment (**docket entry 30**), the same is DENIED since there are material facts in dispute.

SO ORDERED.