**Kevin N. FLYNN and Randy Wolfson, Plaintiffs, Appellants,**

v.

**CITY OF BOSTON, et al., Defendants, Appellees.**

**No. 97–1076.**

United States Court of Appeals, First Circuit.

Heard July 28, 1997.

Decided May 12, 1998.

Mark S. Bourbeau, with whom Liam C. Floyd, Boston, MA, and Bourbeau & Bourbeau, Bonilla, Tocchio & Floyd, LLP were on brief, for Plaintiffs, Appellants.

Mary Jo Harris, Boston, MA, with whom Kopelman and Paige, P.C. was on brief, for Defendants, Appellees.

Before BOUDIN, Circuit Judge, JOHN R. GIBSON,* Senior Circuit Judge, and POLLAK,** Senior District Judge.

BOUDIN, Circuit Judge.

Kevin Flynn and Randy Wolfson appeal from the district court's grant of summary judgment in favor of the defendants in their action alleging that they were discharged from their jobs with Boston Community Centers in violation of the First Amendment. Their former employer is an agency of the City of Boston with 400 employees and a budget of $15 million. It is concerned with the delivery of social services, including child care, youth work, and senior citizen pro-

* Of the Eighth Circuit, sitting by designation.

** Of the Eastern District of Pennsylvania, sitting by designation.

grams, and it administers grants both from city funds and from other sources.

In January 1994, the newly elected mayor of Boston appointed Evelyn Riesenberg, formerly one of his special assistants, as the director of Boston Community Centers. Kevin Flynn was then the associate director of administration and finance; Randy Wolfson was one of two associate directors for field operations. In their later filed court papers, Flynn and Wolfson describe Riesenberg's reign in very unflattering terms.

In particular, they charge that from the outset, Riesenberg pressed Wolfson to tell her which senior staff members had worked for particular mayoral candidates; and Flynn says that Riesenberg asked him how she could fire the entire central office staff and replace them with her own supporters or those of the mayor. Both say that they argued with Riesenberg against this course of action.

They also say that Riesenberg sought, over their opposition, to appoint unqualified personnel to reward supporters of the mayor, and they provide specific examples. Flynn says that Riesenberg ordered him to raise pay for a union worker in violation of the union contract. Flynn and Wolfson also say that Riesenberg mishandled several sexual harassment complaints and related personnel actions, despite their objections.

In August 1994, Riesenberg gave Flynn and Wolfson termination notices, asserting that she was reorganizing the agency. When they protested, the city's corporation counsel wrote to them that they were being discharged because of the reorganization and "an evaluation of their performance." Flynn and Wolfson in turn say that the reorganization was a sham and that neither of them has any negative evaluations in his or her personnel files.

After Flynn and Wolfson were fired, they brought suit in the district court against Riesenberg, the mayor, and the city. The plaintiffs sought declaratory and injunctive relief, and damages under 42 U.S.C. § 1983, on the ground that their First Amendment rights had been infringed; they also made statutory and common law claims based on state law. After discovery, the plaintiffs waived some claims, and the district court dismissed or granted summary judgment in favor of defendants on all of the remaining claims.

■ On summary dispositions, we take the facts and draw inferences in favor of the nonmoving party. *Ortiz–Pinero v. Rivera–Arroyo,* 84 F.3d 7, 11 (1st Cir.1996). But the question whether a position is subject to political discharge, or how far the First Amendment protects against having one's views considered in adverse personnel actions, are essentially legal questions for the court, even if they are close questions. *McGurrin Ehrhard v. Connolly,* 867 F.2d 92, 93 (1st Cir.1989).

From the outset of the Republic, government jobs have gone by political patronage, tempered now by civil service laws that afford varying degrees of protection, especially to lower level employees. *See Elrod v. Burns,* 427 U.S. 347, 377–79, 96 S.Ct. 2673, 2691–92, 49 L.Ed.2d 547 (1976) (Powell, J., dissenting). To this accommodation, the Supreme Court about 25 years ago brought a new constitutional principle: that political firings by the government are allowed only in those jobs for which political loyalty is an "appropriate" criterion. *See Elrod v. Burns,* 427 U.S. 347, 372–73, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1294–95, 63 L.Ed.2d 574 (1980).

In response, the lower federal courts have tried to develop doctrine, but it is largely a porridge of general statements and variables: positions are less likely to be protected to the extent that they are "higher," more "political," more "confidential," and so on; duties prevail over titles; everything depends on circumstances. *See, e.g., Cordero v. De Jesus–Mendez,* 867 F.2d 1, 10–21 (1st Cir.1989); *see also* 4 R.D. Rotunda & J.E. Nowak, *Constitutional Law: Substance and Procedure* § 20.42, at 272–75 (2d ed.1992). To get any practical sense of where the lines have been drawn, one has to look at the results. *See Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236, 241 (1st Cir.1986) (en banc) (collecting cases), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987).

At least in the First Circuit, the cases have regularly upheld against First Amendment challenge the dismissal on political grounds of mid- or upper-level officials or employees who are significantly connected to policy-making. This result has followed where the plaintiff merely represented the agency's policy positions to other entities or to the public or where important personnel functions were part of the portfolio. *See, e.g., Cordero,* 867 F.2d at 11–12, 14. The common thread is that the officials or employees were policymakers or those who are in close working relationships with policymakers.

Thus, we have upheld political discharges of the regional director of an administrative agency, the municipal secretary in a mayor's office, an officer in charge of human resources, a director of public relations, a superintendent of public works, a director of a city's federal programs office, and a director of a satellite office of the Massachusetts Secretary of State.[1] Many such plaintiffs were subordinates within their own offices. Just one decision provisionally protected an official with a high-sounding title, but her duties were essentially technical. *See De Choudens v. Government Dev. Bank of Puerto Rico,* 801 F.2d 5, 9–10 (1st Cir.1986), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987).[2]

By contrast, this court has disallowed political firings for a cleaning supervisor, a career employee administrative aide, and an auditor of books and records. *See Cordero,* 867 F.2d at 14–15, 16–18. The Supreme Court cases, granting or looking toward protection, have involved a floor supervisor, a guard, a process server, an assistant public defender, a rehabilitation counselor, a road equipment operator, a garage worker, and a dietary manager. *See Elrod,* 427 U.S. at 350–51, 372–73, 96 S.Ct. at 2678–79, 2689–90; *Branti,* 445 U.S. at 508, 519–20, 100 S.Ct. at 1289–90, 1295–96; *Rutan v. Republican Party,* 497 U.S. 62, 67, 76, 110 S.Ct. 2729, 2733, 2737–38, 111 L.Ed.2d 52 (1990). Thus, it is primarily low-level jobs that have been protected, although this encompasses most workers in most agencies of government.

■ "Appropriate"—the test used in *Branti*—is an elastic concept, but we have an obligation to apply it consistently within the circuit. Under our prior decisions, Flynn is not protected. As associate director of administration and finance at Boston Community Centers, he had authority over human resource issues, supervision of the grants managers and personnel director, labor negotiations, and liaison responsibilities with a number of city or state agencies. *See Cordero,* 867 F.2d at 11–15; *cf. Goyco,* 849 F.2d at 685. These major responsibilities meant that policy disagreements with his politically appointed supervisor could lead to less effective implementation of political goals.

■ Wolfson is a closer case, but not by much—given the standards of prior cases. She was associate director for field operations and supervised about half the site coordinators, oversaw several programs, served as liaison with two city agencies, oriented new local council members, and monitored compliance with legal requirements. *Cf. Nunez,* 834 F.2d at 24. Like Flynn, Wolfson reported directly to the executive director of the agency and so represented top management in an agency with 400 employees.

The responsibilities of Flynn and Wolfson just described—and these are functions, not titles—obviously implicate policy. Indeed, they are the same kind of senior management functions that our earlier decisions have ascribed to a number of employees found to be subject to political discharge. For example, *Cordero,* 867 F.2d at 13–14,

---

1. *See Jimenez Fuentes,* 807 F.2d at 246; *Cordero,* 867 F.2d at 10–12, 14; *O'Connor v. Steeves,* 994 F.2d 905, 911 (1st Cir.), *cert. denied,* 510 U.S. 1024, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993); *Ortiz–Pinero v. Rivera–Arroyo,* 84 F.3d 7, 17 (1st Cir.1996); *McGurrin Ehrhard v. Connolly,* 867 F.2d 92, 96 (1st Cir.1989).

2. *De Choudens* arose on interlocutory appeal, and this court did not decide that the official was

protected but only that there was enough for a preliminary injunction. Later, in discussing *De Choudens,* this court made clear that an employee involved in technical matters might still be subject to political discharge on account of other duties (public litigation, advice) less technical in nature. *Nunez v. Izquierdo–Mora,* 834 F.2d 19 (1st Cir.1987). *See also Goyco de Maldonado v. Rivera,* 849 F.2d 683 (1st Cir.1988).

upheld the dismissal of a municipality's director of finance, whose primary tasks included supervision of the accounting system, advising officials on fiscal matters, and supervising the disbursement of municipality funds. And in *McGurrin Ehrhard*, 867 F.2d at 93–95, we sustained the dismissal of the director of the Massachusetts Secretary of State's satellite office, whose job consisted essentially of providing information to citizens, "input" into personnel issues, and development of office policies.

■ Under our decisions, an employee is not immune from political firing merely because the employee stands apart from "partisan" politics, *see Mendez–Palou*, 813 F.2d at 1262–63, or is not the ultimate decisionmaker in the agency, *see McGurrin Ehrhard*, 867 F.2d at 95, or is guided in some of his or her functions by professional or technical standards, *see Cordero*, 867 F.2d at 13–14. Rather, it is enough that the official be *involved* in policy, *see Jimenez Fuentes*, 807 F.2d at 246, even if only as an adviser, implementer, or spokesperson, as Flynn and Wolfson certainly were. To hold Flynn and Wolfson to be protected would effectively depart from the main line of case law in this circuit.

One might ask why anyone, apart from elected officials, should be subject to "political" firing. The answer—this is folk wisdom, not mathematical proof—is that to implement their mandates, elected officials need a cadre of agency leaders and top subordinates responsive to the elected officials' goals. *See, e.g., Elrod*, 427 U.S. at 367, 96 S.Ct. at 2686–87. A rule effectively preventing the replacement of senior officials by new administrations would be a very serious step. A legislature can provide such tenure, but the Constitution does not command it.

None of this means that every "political" firing of a senior official is an act of good government. Indeed, if the allegations of the complaint are true, and they are still only allegations, Flynn and Wolfson were public

servants honestly resisting very dubious behavior by a superior. But the main remedy for mismanagement is elections. And officials who rise to the level of Flynn and Wolfson do so at the cost of any *constitutional* tenure protection against political discharge—unless and until the Supreme Court takes a different view and extends *Elrod* and *Branti* further.

■ A different, although related, issue is presented by the plaintiffs' alternative claim that they were fired "in retaliation" for protected speech. The legal standard in this area is notoriously fuzzy because the cases deal under the same head with very different problems and "justifications," for example, the disruptive employee, the whistle-blower who ignores channels, the official who disagrees about policy, the contractor who offers public political criticism of the agency, and so on.[3]

In the present case, we are not concerned with public expressions of political opposition or whistle-blower reports made publicly or within the agency but outside regular channels. Rather, the plaintiffs are policy level officials who disagreed with their superior on a number of policy and personnel issues before the agency and (quite properly, based on their allegations) expressed their disagreement to her. Although Riesenberg denies it, we must suppose (on summary judgment) that plaintiffs could prove at trial that these disagreements contributed to their firing.

To this extent, the plaintiffs' expression of their views on issues played a role in their loss of position, and we will assume *arguendo* that the issues upon which Flynn and Wolfson expressed disagreement are the types of matters "of political, social, or other concern to the community" that the Supreme Court has said would trigger First Amendment analysis. *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689–90. But expressing views on matters of public concern is only the first step in the

---

**3.** *See Pickering v. Board of Educ. of Township High Sch. Dist. 205*, 391 U.S. 563, 564, 88 S.Ct. 1731, 1732–33, 20 L.Ed.2d 811 (1968); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 281–82, 97 S.Ct. 568, 573–74, 50 L.Ed.2d 471 (1977); *Givhan v. Western Line Consol. Sch. Dist.*, 439 U.S. 410, 411–13, 99 S.Ct. 693, 694–95, 58 L.Ed.2d 619 (1979); *Connick v. Myers*, 461 U.S. 138, 140–41, 103 S.Ct. 1684, 1686–87, 75 L.Ed.2d 708 (1983); *Board of County Comm'rs, Wabaunsee County, Kan. v. Umbehr*, 518 U.S. 668, ——, 116 S.Ct. 2342, 2345, 135 L.Ed.2d 843 (1996); *O'Connor*, 994 F.2d at 911–18.

Supreme Court's test for whether an employee is protected by the Constitution from being fired for expressing views.

The second step, vital here, is a balancing of the employee's interests "as a citizen, in commenting upon matters of public concern" against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. at 1734–35. The Supreme Court has identified a number of state interests that might be impaired by an employee's statements (discipline, harmony among co-workers, interference with duties), but one such interest looms large here: the effect of the statements on those "close working relationships for which personal loyalty and confidence are necessary...." *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 2899, 97 L.Ed.2d 315 (1987).

In *Hall v. Ford*, 856 F.2d 255 (D.C.Cir. 1988), the District of Columbia Circuit addressed this type of justification in a situation somewhat akin to this case. In *Hall*, the University of the District of Columbia's athletic director was fired allegedly due to a disagreement between him and the university's president over the university's compliance with its own and NCAA rules. The court held initially that the athletic director's statements were about matters of public concern. It then moved to the second step, as we do in this case.

Recognizing that the Supreme Court had not yet squarely addressed the situation in free speech terms, the District of Columbia Circuit looked to the political patronage cases for help. 856 F.2d at 261–64. "Although not directly applicable, the patronage cases address similar concerns and recognize a government interest that is apposite here." *Id.* at 261. Ultimately, the court upheld the right of the university president to insist on an athletic director who had compatible views on university matters, paralleling the political patronage cases. *See also DiMeglio v. Haines*, 45 F.3d 790, 805–06 (4th Cir.1995).

No mechanical formula exists to resolve all cases where an employee is fired and the firing can be traced back in some causal way to "speech" by the employee.

But we think it is a reasonable working rule that, where the employee is subject to discharge for political reasons under the *Elrod* and *Branti* cases, a superior may also—without offending the First Amendment's free speech guarantee—consider the official's substantive views on agency matters in deciding whether to retain the official in a policy related position. Indeed, without this congruence, the latitude allowed to the superior by the Supreme Court could be effectively nullified.

The issues about which Flynn and Wolfson spoke—and the speech to which they attribute their firings—related to the operation of the office (primarily to matters of hiring, firing and discipline). Yet it is issues of this kind, and the views of management employees about these issues, that are properly considered by the head of the office in deciding who is best suited to be her direct subordinates. Precisely because Flynn and Wolfson's "speech" did bear on the job and on their working relationship with Riesenberg, Riesenberg was permitted to conclude reasonably that she did not have the necessary trust and confidence to retain them.

In this context, it does not make any difference that Flynn and Wolfson may have been "right," and Riesenberg wrong in the positions urged or taken. A jury might easily be confused on this point, thinking that a junior official should be praised and not fired for giving sound advice. But staffing the senior levels of a city agency is the business of the mayor and his appointees, responsible in turn to the electorate, unless a legislature says otherwise.

This does not mean that anything goes for policy-related positions: this would be a different case if an executive were fired for reporting a crime or fraud or for expressing adherence to one church or another. *Compare O'Connor*, 994 F.2d at 915–16. So, too, the situation would be different if a clerical worker, in a non-disruptive and otherwise proper manner, disagreed about how the agency was doing its job. If the employee were not at a policy level, it might be hard to see why such criticism would be pertinent to retention.

■ Further, the lack of a First Amendment claim does not mean that the plaintiffs are without remedy. The district court dismissed plaintiffs' state-law counts for wrongful discharge and related misconduct, and plaintiffs have appealed. But absent federal claims, it is not clear why either this court or the district court should be drawn into issues that involve the construction of state statutes and of state common law as applied to regulate the personnel actions of a local governmental unit.

■ The only jurisdiction in the district court over the state claims was pendent, and the federal claims were dismissed before trial. Given the subject matter, there is special reason why state judges should referee disagreements about whether and when state or local officials may be fired. *Cf. Pyle v. South Hadley Sch. Comm.*, 55 F.3d 20, 22 (1st Cir.1995). Where this is so, and where as here there are few economies in a federal court resolution, the better course is ordinarily to dismiss the state claims without prejudice and leave them to local courts. *Cf. Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988).

For the foregoing reasons, the district court's grant of summary judgment in favor of the defendants on the federal claims is *affirmed,* the district court's grant of summary judgment in favor of the defendants on the state-law claims is *vacated,* and the case is *remanded* for dismissal of the state-law claims without prejudice. Each side shall bear its own costs on this appeal.

*It is so ordered.*

JOHN R. GIBSON, Senior Circuit Judge, dissenting.

I respectfully dissent. In my view, the court today focuses on job title and place in the organizational hierarchy to decide whether a position is subject to a political affiliation requirement. The majority measures the

distance from Wolfson and Flynn to Reisenberg, a policymaker, to determine whether their jobs are political. Although job title and position are certainly relevant to decide whether a position is political, the court's inquiry does not square with the inquiries directed by the Supreme Court in *Branti v. Finkel,* 445 U.S. 507, 518, 100 S.Ct. 1287, 1294–95, 63 L.Ed.2d 574 (1980), or this court in *O'Connor v. Steeves,* 994 F.2d 905, 910 (1st Cir.), *cert. denied,* 510 U.S. 1024, 114 S.Ct. 634, 126 L.Ed.2d 593 (1993), which require a close examination of the overall functions of the employee's department, as well as the particular responsibilities of the position.

Indeed, we have emphasized that the appropriateness of making political affiliation a job requirement is not solely determined by either agency hierarchy or the scope of job duties. "Regardless of the position of an employee within the government hierarchy, or the broad scope of his or her duties, if the employee is responsible only for duties that are measured solely by strictly technical or professional criteria, the job is nonpartisan in nature and not properly a target of patronage dismissal." *Mendez–Palou v. Rohena–Betancourt,* 813 F.2d 1255, 1258 (1st Cir. 1987).

The court today avoids the significance of our en banc decision in *De Choudens v. Government Development Bank of Puerto Rico,* 801 F.2d 5 (1st Cir.1986), *cert. denied,* 481 U.S. 1013, 107 S.Ct. 1886, 95 L.Ed.2d 494 (1987).[4] *De Choudens,* a companion case to *Jimenez Fuentes v. Torres Gaztambide,* 807 F.2d 236 (1st Cir.1986) (en banc), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987), nonetheless, is controlling. De Choudens had been Senior Vice–President of Finance at the Puerto Rico Government Development Bank, one of three vice presidents serving under the president and executive vice president. *Id.* at 6. The bank's primary functions were to act as fiscal agent and financial advisor to the Commonwealth of Puerto Rico, its governor, and po-

---

4. While *De Choudens* granted a preliminary injunction, the only limitation to its ruling is that later development of the record for a permanent injunction could cause a different result if we found "a sufficient nexus" between the position and "policy relating to partisan concerns." 801

F.2d at 10. The cases cited by the court have uniformly endorsed *De Choudens,* only finding it distinguishable on its facts. *See, e.g., Nunez v. Izquierdo–Mora,* 834 F.2d 19, 23–25 (1st Cir. 1987); *Goyco de Maldonado v. Rivera,* 849 F.2d 683, 685–86 (1st Cir.1988).

litical subdivisions; lender to government and private industry; and depository of Commonwealth funds. *Id.* at 8. De Choudens claimed that she was demoted because of her political affiliation, and we affirmed the district court's order reinstating her.

We held that the bank had "indicia of legitimate partisan goals for government operations, not far removed from some of the policy objectives of [the agency] discussed in *Jimenez Fuentes.*" *Id.* at 8. Unlike *Jimenez Fuentes,* however, we concluded that De Chouden's job position did not justify a political affiliation requirement. She was a "staff official who, while indubitably in a policymaking, confidential, and communicative position, is both empowered and constrained by the limits of her specialized functions." *Id.* at 9. Unlike the department in *Jimenez Fuentes,* "her division [was] not a microcosm of the larger agency." *Id.* The government emphasized her broad discretion in rule-making, reorganization, accounting policy, investment strategy, and budget and personnel recommendations, but we found the need for political affiliation lacking:

> While these responsibilities signify a position of substance, of valued policy contributions, recommendations, and advice, they involve *politically-neutral, technical, and professional matters.* Similarly, though plaintiff was indeed an agency spokesperson, there is *no suggestion of any "party line" or political, goal-oriented message that she ever communicated.*

*Id.* (emphasis added).

The court today gives only brief consideration to the tasks required of Flynn and Wolfson. The court does not focus on whether Flynn's and Wolfson's duties are "politically-neutral," "technical," or "professional," *De Choudens,* 801 F.2d at 9, or whether their duties are those of a "policy maker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally ap-

propriate requirement." *O'Connor,* 994 F.2d at 910. Nor does the court consider factors relevant to this determination such as "relative pay, technical competence, power to control others, authority to speak in the name of policy-makers, public perception, influence on programs, contact with elected officials and responsiveness to partisan politics and political leaders." *Jimenez Fuentes,* 807 F.2d at 242.

Wolfson, as Associate Director for Field Operations, has described her job as:

> overseeing the operations at 20 Community centers, including recreation, aquatics, programming, personnel, and budgets, monitoring the various programs of the [Boston Community Centers] for compliance with municipal, state, and federal regulations, providing technical assistance to the non-profit corporate arms of the centers, writing of the operational and non-profit fiscal compliance manuals for the agency, and supervision of capital improvements, maintenance, and repairs.

The City submitted a written job description[5] for Wolfson's position. The description provided that the Associate Director "shall, under the Director ... oversee the daily operations of the Boston Community Schools & Recreation Centers Program." The responsibilities included: monitoring, supervising, and assisting the coordinators; assisting in the governance process as it applies to the formation of new councils; facilitating referral and support networks between local operations; providing technical assistance in the recruitment and hirings of coordinators; and giving orientation and supervision to coordinators during the initial ninety days of employment.

Viewing the evidence in the light most favorable to Wolfson, I do not believe that party affiliation is an appropriate job requirement for her position. The focus of her responsibilities was community center opera-

---

5. Wolfson contends that this description was not the official description when she was employed by the Central Office. The district court relied on Wolfson's deposition testimony describing her position, and did not rely on this description. Nevertheless, I have reviewed the description and believe it is largely consistent with Wolfson's testimony describing her job. Flynn and Wolfson also attached to their affidavits job descriptions contained in the Operations Manual for the Boston Community Centers. The district court, however, struck these affidavits, which were submitted after the close of discovery.

tions, and she was involved in "hands-on," day-to-day operations. Wolfson was responsible for operational concerns such as recreational programs, program personnel and budgeting, maintenance and capital improvements, and compliance with applicable regulations. She testified in her deposition that she oversaw the Boston Neighborhood Basketball League and supervised the aquatics directors for the pools. She explained that she worked with the advisory board and councils for the community centers, and her role was to ensure compliance with the plan of operations. Political party goals do not play a role in these aspects of operations. Rather, her specialized job responsibilities involved "politically-neutral, technical, and professional matters." *De Choudens,* 801 F.2d at 9. *See Cordero v. DeJesus-Mendez,* 867 F.2d 1, 14–15 (1st Cir.1989). Although Wolfson had a connection to some policy-making functions, her specialized functions did not create or impact any policies of the department. *See De Choudens,* 801 F.2d at 6. There is no doubt that Wolfson occupied an important position with the Boston Community Centers, however, there is no evidence that her position allowed her to make partisan decisions, nor is there any suggestion that she ever communicated any political message. *See De Choudens,* 801 F.2d at 9. *Cf. Hall v. Ford,* 856 F.2d 255, 265 (D.C.Cir. 1988) ("highly visible spokesman"). Political affiliation is not an appropriate job requirement.

Similarly, Flynn describes his job responsibilities as including the:

> oversight of all finance and personnel functions within the [Boston Community Centers], preparation and implementation of the department budget, supervision of state, federal, and private grants management, management of the agency's payroll and contract functions, providing fiscal, legal, and personnel assistance to the nonprofit corporate arms of the centers liaison to the city's law department, labor relations, and federal agencies.

Flynn's written job description[6] describes Flynn's duties as: planning and evaluating administrative procedures for the programs; developing analytical models for use in the evaluations; preparing statistical reports and working with others to evaluate the data; and developing procedural guidelines for appropriate staff.

I agree that reviewing Flynn's political affiliation claim is a closer question than Wolfson's because Flynn's position was more closely involved with policy formulation and confidential information at the Central Office. Nevertheless, viewing the evidence in the light most favorable to Flynn, as we are required to in the appeal from summary judgment, I believe that his position did not concern partisan political interests. Flynn's position lacked the capabilities of influencing political goals. His affidavit states that he "never worked with the Mayor's office to establish goals and objectives . . . but only to find out what the goals and objectives were." Flynn explained in his deposition that "[t]he largest political policy issues would be dealt with [sic] the executive director." Although Flynn was in charge of preparing the department budget, his deposition clarifies that he prepared the budget following the directives from the mayor and executive director. Flynn's responsibilities seem quite similar to those in *Fontane–Rexach v. Puerto Rico Electric Power Authority,* 878 F.2d 1493, 1495, 1500 (1st Cir.1988), in which we noted that although the supply officer would not always approach his job in a uniform way, it was improbable that his decisions would involve partisan political goals. *Id.* at 1496. Likewise, Flynn's job duties were largely limited to the technical and specialized aspects of finance and budgeting, and his duties beyond those areas carried only a limited potential for influencing political goals. As in *De Choudens,* Flynn was essentially a staff official with specialized knowledge, and "although his position involved policy-making, the reposing of confidence, and communicating," such functions were "remote from advancing or thwarting the agen-

---

**6.** Like Wolfson, Flynn contends that this was not the official job description when he was employed by the Central Office. The district court did not rely on this description, but on Flynn's deposition testimony. Nevertheless, the description appears to be, in many respects, consistent with Flynn's description of his job.

cy's partisan-responsive goals." *See* 801 F.2d at 6. Accordingly, political affiliation is not an appropriate requirement.

I believe that Flynn and Wolfson have presented evidence sufficient to survive summary judgment on their claim that they were terminated from their jobs because of their lack of political affiliation with the Mayor. Accordingly, I would reverse the district court's judgment on this issue.

Because I conclude that Flynn's and Wolfson's positions are not political positions, I also part company with the court's view that they have no First Amendment claim.

Flynn's and Wolfson's objections to Riesenberg's handling of certain sexual harassment claims constitute a matter of legitimate public concern. The allegations bear on Riesenberg's fitness to serve as Executive Director, similar to the public concern we identified in *O'Connor. See* 994 F.2d at 915. Because such statements concern a topic which is a matter of inherent concern to the public, we need not examine plaintiffs' personal motivations for speaking out. *Id.* at 915.

I concede that the employees' objections to Riesenberg about personnel practices present a more difficult circumstance. In *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), the Court considered a questionnaire circulated by an assistant district attorney, inquiring about matters such as the office's transfer policy, office morale and the level of confidence in supervisors. *Id.* at 141, 103 S.Ct. at 1686–87. The Court concluded that this speech related only to internal office policy and did not touch upon matters of public concern.[7] *Id.* at 154, 103 S.Ct. at 1693–94.

Compared to the speech in *Connick*, however, the complaints of Flynn and Wolfson about office policies and procedures touch upon matters more likely to be of public concern, i.e., whether the city based personnel decisions on political alliances without regard to qualifications. Because this speech does not necessarily qualify on its face as a matter of public concern, we must examine its context more fully. *See O'Connor*, 994 F.2d at 914. Unlike the statement in *Connick*, the statements at issue were not made *after* the adverse employment decision, thus suggesting retaliation, and were not directly related to the plaintiffs' own employment situation. *See* 461 U.S. at 148, 103 S.Ct. at 1690–91. While this is a close issue, I am convinced that the employees' evidence is sufficient to survive summary judgment. Personnel decisions based on political affiliation are much more than an individual employee's grievance against his employer. *See Connick*, 461 U.S. at 148, 103 S.Ct. at 1690–91. I do not address the second and third steps of the *O'Connor* analysis (balancing of interests and consideration of motivations for plaintiffs' terminations) because the district court did not reach those issues. *See* 994 F.2d at 912–13. I would only hold that the employees have raised a genuine factual issue as to whether they engaged in speech concerning a matter of public concern protected by the First Amendment.

Finally, I would also allow Flynn and Wolfson to assert their pendent state law claims for wrongful termination. The district court decided that a "whistleblowing" employee may be entitled to public protection under Massachusetts law. Nevertheless, the court granted summary judgment in the city's favor on the wrongful termination claim because of its ruling that the employees' speech criticizing Riesenberg's decision did not constitute whistleblowing. I have reached a contrary conclusion as to the public nature of the speech in question and, therefore, I would conclude that there is a genuine issue of material fact as to whether the speech at issue falls within the public policy exception. *See GTE Products Corp. v. Stewart*, 421 Mass. 22, 653 N.E.2d 161, 164–65 (1995).

I would reverse the district court's judgment.

---

7. The questionnaire did touch upon one matter of public concern—pressure on employees to work in political campaigns—but the Court examined the circumstances of the plaintiff's circulation of her questionnaire and concluded that it was "most accurately characterized as an employee grievance concerning internal office policy." 461 U.S. at 154, 103 S.Ct. at 1694.