**Julio I. SOTO, Plaintiff**

v.

**Andrew P. BZDEL, Edmund Hartwell and Daniel Rose, Defendants**

**No. CIV.A. 01–30043–KPN.**

United States District Court,
D. Massachusetts.

July 26, 2002.

Benjamin A. Barnes, Northampton, MA, for Julio I. Soto, Plaintiff.

Joseph P. Kittredge, Law Office of Timothy M. Burke, Needham, MA, for Andrew P. Bzdel, Daniel Rose, Defendants.

*MEMORANDUM AND ORDER WITH REGARD TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 25)*

NEIMAN, United States Magistrate Judge.

Massachusetts State Troopers Andrew Bzdel ("Bzdel"), Edmund Hartwell ("Hartwell") and Daniel Rose ("Rose") (collectively "Defendants") seek summary judgment with respect to all counts of Julio I. Soto ("Plaintiff")'s complaint. In essence, Plaintiff contends that Defendants' actions in arresting him—ostensibly pursuant to a warrant that had been recalled—violated his federal civil rights. In addition, Plaintiff alleges that, under state law, Defendants subjected him to false arrest and imprisonment and intentionally inflicted emotional distress upon him. Accepting Plaintiff's factual allegations as true for purposes of summary judgment, Defen-

---

dants argue, in applicable part, that they are qualifiedly immune from suit.[1]

For the reasons which follow, the court agrees with Defendants' qualified immunity argument and, therefore, will grant them summary judgment with respect to Plaintiff's federal civil rights claims. However, the court will decline to exercise supplemental jurisdiction over Plaintiff's remaining state law causes of action and, accordingly, will dismiss those claims without prejudice.

## I. FACTUAL BACKGROUND

At summary judgment, the record is viewed in the light most favorable to non-moving party. *See Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir.1993). Accordingly, the following background is taken verbatim from Plaintiff's Local Rule 56.1 statement of material facts, which is included within his memorandum of law:

On October 26, 1999, Plaintiff ... was employed as a machine operator at Mill Valley Moldings on West Street in Hatfield, Massachusetts[,] working the third shift, from 11:00 p.m. until 7:00 a.m.... [Plaintiff] went to work [that evening] at 11:00 p.m. At approximately 3:15 a.m., [Plaintiff] took a 30 minute break, stepped outside of the Mill Valley Moldings building to have a cigarette, and then decided to go to the store to get some "lunch." As [P]laintiff left the Mill Valley Moldings parking lot in his Ford Taurus, he made a complete stop, then turned right.... Approximately ten to fifteen feet after [P]laintiff turned out of the parking lot, he was stopped by a Massachusetts State Police trooper.

---

1. The parties have consented to the jurisdiction of this court pursuant to 28 U.S.C. § 636(c) and FED. R. CIV. P. 73(b).

The State Police trooper, who [P]laintiff subsequently learned was ... Bzdel, approached [P]laintiff's vehicle. Plaintiff rolled down the driver side window, and ... Bzdel asked for [P]laintiff's driver's license and registration—which Plaintiff provided.... Bzdel then went back to his car.

At that time[, P]laintiff removed a Notice of Recall of Warrant [ (hereinafter the "Notice of Recall") ] from his wallet and placed it in the front pocket of the sweatshirt he was wearing.... [The Notice of Recall concerned a prior warrant issued by the Northampton District Court for failure to pay a fine plus court costs totaling $165. Plaintiff was provided with the Notice of Recall at a hearing on September 7, 1999. At the September 7th hearing, Plaintiff] was told by the Court to keep the Notice [of Recall] with him at all times as proof of the recall of the warrant.

While ... Bzdel was at his cruiser with [Plaintiff]'s license and registration, a second police car, containing ... Hartwell and Rose, arrived at the scene. When ... Bzdel returned to [P]laintiff's vehicle, he told [P]laintiff to get out and step away from his vehicle. Plaintiff, pursuant to ... Bzdel's instructions, got out of his car and stood at the rear of his car. Plaintiff inquired [as to] why he was being arrested and ... Bzdel told him that there was an outstanding warrant for his arrest. Plaintiff asked what the warrant was for but ... Bzdel did not answer [P]laintiff's question.[2]

Upon hearing ... Bzdel's statement that there was an outstanding warrant against him, Plaintiff took the Notice of Recall ... out of his sweatshirt pocket and told ... Bzdel that the warrant in question had been recalled and cancelled, in Northampton District Court, in the Clerk's office. Plaintiff showed the folded Notice [of Recall] to ... Bzdel who placed [it] in the ... front pocket of [Plaintiff's] sweatshirt without reading it.

Plaintiff's hands were cuffed behind his back and Bzdel ... informed [Plaintiff] that he was under arrest. At that time, ... Hartwell and Rose exited their police vehicle.... Hartwell, Rose and Bzdel stood approximately four feet from [P]laintiff and talked together.... Hartwell and Rose then took custody of [Plaintiff] ... and escorted him to their vehicle. While walking towards the vehicle, Plaintiff ... stated to ... Hartwell and Rose that the outstanding warrant had been cleared and asked why he was being arrested if the warrant had cleared. [Plaintiff] also informed ... Hartwell and Rose that he had in his possession a Notice of Recall[, but] ... Hartwell and Rose ignored [him].

[Plaintiff] was taken to the State Police building on Route 5 ... [where] his clothing and belongings were inventoried. [Hartwell and another, as yet unnamed, booking officer conducted the inventory.] During the inventory, [Plaintiff] took the Notice of Recall from his sweatshirt pocket and handed it to the booking officer. Again [Plaintiff] asked why he was being arrested. The officer unfolded the Notice of Recall ..., appeared to read it, re-folded it and placed it in Plaintiff's wallet without comment. [Plaintiff]'s bail was set at $279.00 and he was placed in a cell for the remainder of the evening....

---

**2.** Both sides agree, for purposes of Defendants' motion, that the outstanding warrant had been previously entered into Massachusetts' Warrant Management System ("WMS").

The statute establishing the WMS, Mass. Gen. L. ch. 276, § 23A, became effective on February 1, 1995.

[Plaintiff] was taken from his cell the next morning. His personal belongs were returned to him after he signed for them. [Plaintiff] was again placed in handcuffs and taken to Court. [Plaintiff] was placed in a holding cell at the courthouse and then taken to the courtroom at around 9:00 a.m. His case was called approximately two hours later and his hearing lasted less than five minutes. After [Plaintiff]'s case was called, District Court Judge Michael Ryan apologized to [Plaintiff] for his arrest and immediately released him after noting that his warrant had been previously recalled.

(Docket No. 29 at 2–6 (citations and footnote omitted).)

## II. PROCEDURAL BACKGROUND

Plaintiff filed his four-count complaint on March 16, 2001. In it, he alleged that Bzdel violated 42 U.S.C. § 1983 ("section 1983") (Count I), falsely arrested and imprisoned him (Count II) and intentionally inflicted emotional distress upon him (Count III). Plaintiff also sought punitive damages from Bzdel pursuant to section 1983 (Count IV). An amended complaint, filed on August 27, 2001, includes Rose and Hartwell as defendants in all four counts. On April 29, 2002, after the conclusion of discovery, Defendants submitted the present motion for summary judgment. In due course, Plaintiff tendered his opposition and the court heard oral argument.

## III. SUMMARY JUDGMENT STANDARD

A court may grant summary judgment pursuant to FED. R. CIV. P. 56(c) if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995). A "genuine" issue is one "that a reasonable jury could resolve ... in favor of the nonmoving party." *McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995). *Accord United States v. One Parcel of Real Property, Great Harbor Neck, New Shoreham, R.I.,* 960 F.2d 200, 204 (1st Cir.1992).

Not every genuine factual conflict, however, necessitates a trial. " 'It is only when a disputed fact has the potential to change the outcome of the suit under the governing law if found favorably to the nonmovant that the materiality hurdle is cleared.' " *Parrilla–Burgos v. Hernandez–Rivera,* 108 F.3d 445, 448 (1st Cir. 1997) (quoting *Martinez v. Colon,* 54 F.3d 980, 983–84 (1st Cir.1995)). At bottom, matters of law are for the court to decide at summary judgment. *Blackie v. Maine,* 75 F.3d 716, 721 (1st Cir.1996).

## IV. DISCUSSION

As became clear at oral argument, the crux of this case is Plaintiff's federal claims, i.e., his section 1983 causes of action. Accordingly, the court will discuss those claims first.

### A. FEDERAL CLAIMS

With respect to Plaintiff's federal claims, Defendants assert that they cannot be liable to Plaintiff pursuant to section 1983 because his allegations do not rise to the level of a federal constitutional violation.[3]

---

**3.** In pertinent part, section 1983 states as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District

Defendants also argue that, even if there is a constitutional violation, they, as governmental officials, have qualified immunity from liability for actions taken in the course of their official duties. For the reasons which follow, the court finds that a federal constitutional claim has been properly alleged by Plaintiff, but agrees with Defendants that they are qualifiedly immune from Plaintiff's section 1983 causes of action.

### 1. *Qualified Immunity Principles*

The affirmative defense of qualified immunity shields public officials from liability in civil actions for alleged violations of constitutionally protected rights. *See Anderson v. Creighton,* 483 U.S. at 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). In essence, qualified immunity operates "to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful." *Saucier v. Katz,* 533 U.S. 194, 206, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). The primary purpose of qualified immunity "is to protect [public officials] 'from undue interference with their duties and from potentially disabling threats of liability.'" *Elder v. Holloway,* 510 U.S. 510, 514, 114 S.Ct. 1019, 127 L.Ed.2d 344 (1994) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 806, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). At bottom, qualified immunity serves several purposes; it protects public officials' "ability to serve the public good," *Wyatt v. Cole,* 504 U.S. 158, 167, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), guarantees that the threat of liability does not dissuade individ-

uals from entering public service, *see id.,* and permits officials to perform discretionary tasks that they would otherwise fear to undertake, *see Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985).

When evaluating a qualified immunity defense, a court first must determine (1) "whether [the] plaintiff has alleged a deprivation of a constitutional or federal right by the defendant official" and (2) "whether that right was clearly established at the time of the [official's] alleged violation." *Kelley v. LaForce,* 288 F.3d 1, 6 (1st Cir.2002) (citations and internal quotation marks omitted). Only if these two questions are answered in the affirmative should the court answer a third question, whether, with respect to the particular conduct at issue, "an objectively reasonable official would have believed that his conduct was lawful in light of clearly established law and the information the official possessed at the time of this allegedly unlawful conduct." *Id.* at 7 (citation and internal quotation marks omitted). Although the determination of objective reasonableness "will often require examination of the information possessed by the ... officials," it does not include an examination of the official's subjective intent. *Anderson,* 483 U.S. at 641, 107 S.Ct. 3034. *See Abreu–Guzman v. Ford,* 241 F.3d 69, 73 (1st Cir.2001).

In undertaking this task, the court has assumed, as the parties appear to concede, that there are no disputes as to any material fact and, therefore, that the inquiries must be resolved by the court, not a jury.

---

of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress .... 

42 U.S.C. § 1983. In other words, "[t]his statute supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution ...." *Deniz v. Municipality of Guaynabo,* 285 F.3d 142, 145–46 (1st Cir. 2002) (citation and internal quotation marks omitted).

*See Prokey v. Watkins,* 942 F.2d 67, 73 (1st Cir.1991). The court thus accepts as true for purposes here Plaintiff's contention that he immediately made Defendants aware of the Notice of Recall, but that they chose instead to rely on the WMS.[4]

## 2. *Application*

■ "The threshold inquiry a court must undertake in a qualified immunity analysis is whether [the] plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer,* —— U.S. ——, ——, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002). With respect to this first question, Plaintiff asserts that Defendants violated the Fourth Amendment's proscription against unreasonable seizures.[5] As Plaintiff puts it in his memorandum of law: "[I] was arrested on a warrant that had been recalled six weeks earlier despite the fact that [I] presented [D]efendants with a valid Notice of Recall .... Such an arrest is unlawful and deprived [me of my] right to be secure in [my] person against an unreasonable seizure." (Docket No. 29 at 16.)

If probable cause to arrest an individual exists, no unconstitutional deprivation can occur. *See Mann v. Cannon,* 731 F.2d 54, 62 (1st Cir.1984) (explaining that to prove a Fourth Amendment violation pursuant to section 1983, a "plaintiff must show at a minimum that the arresting officers acted without probable cause"). A valid warrant, the parties appear to agree, provides the necessary cause. Here, however, Plaintiff not only questions the validity of the warrant identified through the WMS, but asserts that Defendants were constitutionally required to reassess their actions once Plaintiff brought the Notice of Recall to their attention. Probable cause to arrest him, Plaintiff maintains, did not suspend Defendants' continuing obligation to act "reasonably."

Plaintiff's position finds support in *Thompson v. Olson,* 798 F.2d 552 (1st Cir. 1986). There, the First Circuit examined a claim under Maine law of false imprisonment and determined that a police officer's initial finding of probable cause justified a warrantless arrest and detention for the purpose of bringing the arrestee before a magistrate. *Id.* at 556 (citing *Gerstein v. Pugh,* 420 U.S. 103, 113–14, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975)). The First Circuit intimated, however, that "a police officer, upon an initial finding of probable cause, may [not] close his eyes to all subsequent developments." *Id.* "Probable cause to arrest," the court stated, "does not suspend an officer's continuing obligation to act 'reasonably.'" *Id.* "On the other hand," the court continued, "having once determined that there is probable cause to arrest, an officer should not be required to

---

4. Had Defendants looked at the Notice of Recall, they likely would have read the following language directed at Plaintiff: "KEEP THIS NOTICE ON YOUR PERSON AS EVIDENCE OF THE RECALL in the event that a law enforcement officer questions you about the above warrant(s)." (Docket No. 29, Exhibit B to Exhibit E (emphasis in original).) Defendants may well have also discovered that the "date of recall" section in [P]laintiff's copy was blank, (see *id.*), which might explain why his particular recall had not been placed properly into the WMS computer system. For factual purposes here, however, Defendants are assumed not to have looked at the

notice but to have been informed of it by Plaintiff.

5. The Fourth Amendment provides as follows: "The right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.

reassess his probable cause conclusion at every turn, whether faced with the discovery of some new evidence or a suspect's self-exonerating explanation from the back of a squad car." *Id.* The court decided to "leave for another day the question of when ... a post-arrest duty arises and how much investigation is necessary to meet that duty." *Id.* at 557.

Although the case at bar concerns an arrest on a warrant, *Thompson's* reasoning applies. *See Brady v. Dill,* 187 F.3d 104, 111 (1st Cir.1999) ("If the rule we recognized in *Thompson* applies to a warrantless arrest, it must apply, *a fortiori,* to an arrest of a person named in a facially valid warrant."). In the court's opinion, a plaintiff may state a constitutional claim if, while a police officer is making an arrest pursuant to a warrant, the officer fails to release the plaintiff after the officer receives information upon which to reasonably conclude that the warrant had been recalled. Thus, viewing the facts here in a light most favorable to Plaintiff—particularly the fact that Plaintiff made Defendants aware of the Notice of Recall, but that Defendants chose not to look at that notice—the court finds, for present purposes, that Plaintiff has sufficiently alleged that he was unreasonably "seized" in violation of the Fourth Amendment.

With regard to the second and, in effect, the third questions, Plaintiff asserts that the law was "clearly established" at the time of the incident that Fourth Amendment seizures must be conducted in a reasonable manner. That may be true as a general proposition. *See Ringuette v. City of Fall River,* 906 F.Supp. 55, 57 (D.Mass. 1995) (noting that "the general right to be free from unreasonable seizures is 'clearly established'") (citing cases). However, as the First Circuit has explained, "the inquiry whether the right at issue [is] clearly established properly focuses not upon the

right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." *Singer v. State of Me.,* 49 F.3d 837, 845 (1st Cir.1995) (citations and internal quotation marks omitted). *See also St. Hilaire v. City of Laconia,* 71 F.3d 20, 24–25 (1st Cir.1995). Moreover, to prove that an asserted right is "clearly established," a plaintiff must cite "cases of controlling authority in [his] jurisdiction at the time of the incident which clearly established the rule on which [he] seek[s] to rely" or identify "a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne,* 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Simply put, Plaintiff fails to make such a showing here.

Unfortunately for Plaintiff, there is no First Circuit or Massachusetts state court decision directly on point. As described, *Thompson* is indirectly applicable at best. *Commonwealth v. Hecox,* 35 Mass.App.Ct. 277, 619 N.E.2d 339 (1993), which ordered the suppression of evidence seized in the course of a stop by a police officer who was unaware that a warrant he thought existed was no longer outstanding, *see id.* at 341–42, was decided before the WMS was implemented. In any event, *Hecox* involved the failure of law enforcement authorities themselves to keep updated records and was directed at deterring unlawful police conduct. *See id.* at 342.

To be sure, some authority might be found in *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), and *Brady v. Dill,* 187 F.3d 104 (1st Cir.1999). Both decisions, however, concern post-arrest situations and actually stand for the proposition that, for the most part, an officer is not constitutionally bound to look beyond a facially valid warrant in determining qualified immunity. In *Baker,* the

Supreme Court rejected the plaintiff's section 1983 claim that the defendant sheriff failed to investigate and determine that the wrong man was imprisoned. *See id.*, 443 U.S. at 143–44, 99 S.Ct. 2689. In *Brady*, the First Circuit held that state troopers did not violate an arrestee's constitutional rights when, after arresting him pursuant to a facially valid warrant, they continued to detain him even though they allegedly came to believe his protestations of innocence. *Id.*, 187 F.3d at 109. The *Brady* court specifically declined to address the situation, as may well have occurred here, "in which the police fail to release a person previously detained upon learning that the arrest warrant on which they had relied ha[d] been withdrawn or otherwise invalidated." *Id.* at 112 n. 8.

At best, Plaintiff cites the affidavit of Genevieve Keller, clerk-magistrate of the Northampton District Court, in support of his position. In her affidavit, Keller states that even though the WMS replaced a "paper-driven" warrant system, it still generates a paper Notice of Recall for subjects to carry. (Docket No. 29, Exhibit E ¶ 8.) From this, Plaintiff concludes that since a paper Notice of Recall is still issued, it supplants the information in the WMS database. However, Keller's affidavit, while descriptive of the operative system, is insufficient to show that the constitutional right, as described by Plaintiff, was clearly established in October of 1999. As indicated, the WMS only came into effect in 1995 and Plaintiff cites no applicable decision construing its contours.

As a result, the court must answer the second question in the qualified immunity analysis in the negative. Plaintiff has "not brought to [the court's] attention any cases of controlling authority in [this] jurisdiction at the time of the incident which clearly established the rule on which [he] seek[s] to rely," nor has he "identified a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson*, 526 U.S. at 617, 119 S.Ct. 1692. It need hardly be said, therefore, with regard to the third question that no objectively reasonable officer in October of 1999 would have believed that disregarding Plaintiff's Notice of Recall and arresting him based on information from the WMS, as did Defendants, was lawful in light of clearly established law.[6]

The court adds a few additional thoughts. "Because qualified immunity does not address the substantive viability of a section 1983 claim, but rather the objective reasonableness of a defendant's actions, a plaintiff who is entitled to prevail on the merits is not necessarily entitled to prevail on the issue of qualified immunity." *Collins v. Marina–Martinez*, 894 F.2d 474, 478 (1st Cir.1990). Accordingly, even though Defendants may well have been cavalier in dealing with Plaintiff, and thus might lose were the court to consider the merits, they cannot reasonably be charged with knowing that they were violating a

---

**6.** As it turns out, courts in other jurisdictions have granted qualified immunity in similar cases. *See Duckett v. City of Cedar Park, Tex.*, 950 F.2d 272, 280 (5th Cir.1992) (despite plaintiff's protestations that warrant had been recalled, officer's reliance on computer information for arrest found to be objectively reasonable for qualified immunity purposes); *Lauer v. Dahlberg*, 717 F.Supp. 612, 613 (N.D.Ill.1989) (similar), *aff'd*, 907 F.2d 152 (7th Cir.1990). *See also Mitchell v. Aluisi*, 872 F.2d 577, 578 (4th Cir.1989) (officers did not violate due process when they executed warrant which, though facially valid, had been recalled). *Cf. United States v. Roper*, 702 F.2d 984, 989 (11th Cir.1983) (observing that "the cases uniformly recognize that [National Crime Information Center] printouts are reliable enough to form the basis of the reasonable belief which is needed to establish probable cause for arrest") (quoting *United States v. McDonald*, 606 F.2d 552, 554 (5th Cir.1979)).

clearly established right. This ought not hold true in the future.[7] Presently, however, Defendants fall under the umbrella of qualified immunity and the court will grant them summary judgment on Counts I and IV.

## B. STATE CLAIMS

■ Having determined that Defendants are entitled to qualified immunity, and thus summary judgment, on Plaintiff's federal claims, the court must determine whether it should continue to exercise jurisdiction over Plaintiff's state-based claims of false arrest and imprisonment (Count II) and the derivative claim of intentional infliction of emotional distress (Count III). *See* 28 U.S.C. § 1367(c)(3) (allowing court to "decline to exercise supplemental jurisdiction over [pendent state] claim[s] ... if ... the ... court has dismissed all claims over which it had original jurisdiction"). For the reasons which follow, the court believes that such ongoing jurisdiction is inappropriate in the circumstances presented here.[8]

As the First Circuit has explained, citing 28 U.S.C. § 1367(c)(3), "[i]n a federal-question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion." *Roche v. John Hancock Mut. Life Ins. Co.,* 81 F.3d 249, 256–57 (1st Cir.1996). Thus, dismissal is by no means required. Accordingly, the dismissal of Plaintiff's section 1983 claims does not necessarily "strip[ ] the court of power to exercise jurisdiction over the remaining state-law claims." *Id.* at 256. *See also Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1177 (1st Cir.1995).

The decision to retain or disclaim jurisdiction lies within the broad discretion of the court. *Vera–Lozano v. Int'l Broadcasting,* 50 F.3d 67, 70 (1st Cir.1995). The standards by which that discretion is to be exercised are set forth in *Roche:*

> In deciding whether or not to retain jurisdiction on such an occasion, the trial court must take into account concerns of comity, judicial economy, convenience, fairness, and the like. While dismissal may sometimes be appropriate if the federal-question claim is eliminated early in the proceedings, each case must be gauged on its own facts. The preferred approach is pragmatic and case-specific.

*Roche,* 81 F.3d at 257 (citations and internal quotation marks omitted). *See also Newman v. Burgin,* 930 F.2d 955, 963–64 (1st Cir.1991). In *Roche,* as it turns out, the First Circuit affirmed the district court's retention of jurisdiction over the state law claims.

Here, as in *Roche,* "discovery ha[s] closed, the summary judgment record [is] complete ... and powerful interests in both judicial economy and fairness tug[ ] in favor of retaining jurisdiction." *Roche,* 81

---

**7.** *See* Heather Cary, Note, *Constitutional Law—Joyce v. Town of Tewksbury: The Fourth Amendment's Protection of Liberty and Privacy Versus Qualified Immunity,* 21 W. NEW ENG.L. REV. 513, 559–60 (1999) ("Although a court may deem the available precedent 'unsettled,' such a determination not only leaves the law unclear, but also disrupts the evolution of constitutional law. If courts deciding § 1983 suits on the basis of qualified immunity were to tackle the difficult substantive law, then the law would become 'clearly established' so

that officers presented with similar factual scenarios in the future would not be able to trample the rights of others.") (footnotes omitted).

**8.** Defendants stated at oral argument that their qualified immunity defense is applicable only to Plaintiff's two claims under section 1983 and, thus, did not discuss the defense with respect to the remaining state law causes of action.

F.3d at 257. However, by their very nature, the federal and state claims are not inextricably intertwined. *See Baker*, 443 U.S. at 146, 99 S.Ct. 2689 ("Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles.... [F]alse imprisonment does not become a violation of the [Constitution] merely because the defendant is a state official.") In addition, the court believes that its exercise of ongoing jurisdiction would intrude into the right of the Massachusetts courts to decide what appear to be new and important state law questions, namely, the application of a relatively recent (and basically unconstrued) state statute, MASS. GEN. L. ch. 276, § 23A, to state common law claims of false arrest and imprisonment. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (while a court should consider judicial economy, convenience and fairness, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of the applicable law").

As pertinent here, MASS. GEN. L. ch. 276, § 23A provides as follows:

No law enforcement officer, who in the performance of his duties relies *in good faith* on the warrant appearing in the warrant management system and, in turn, the criminal justice information system, shall be liable in any criminal prosecution or civil action alleging false arrest, false imprisonment, or malicious prosecution or arrest by false pretenses.

(emphasis added).[9] Accordingly, the state law issues here—whether Plaintiff was subjected to false arrest or imprisonment—turn on the statute, i.e., whether Defendants relied in "good faith" on the WMS printout, which indicated that a warrant was outstanding against Plaintiff, (see Docket No. 26, Exhibit C), in preference to Plaintiff's proffered Notice of Recall, which Defendants refused to honor let alone read.

Given the relatively recent creation of the WMS, Massachusetts courts have not yet defined, let alone applied, the "good faith" statutory standard raised by Defendants as an affirmative defense.[10] Although the court is willing to say at this time that the "good faith" standard is by its very nature a subjective, rather than an objective, inquiry—as distinct from the federal "qualified immunity" standard addressed above—it is reluctant to further define the contours of that standard without established guidance from the state courts. *See Flynn v. City of Boston*, 140 F.3d 42, 48 (1st Cir.1998) ("Absent federal claims, it is not clear why ... the district

---

9. The statute begins by stating that an issuing court is to enter a defendant's information and the name of the police department responsible for serving a warrant into the WMS. *See id.* Thus, "[t]he statute assumes that a warrant has been validly issued prior to its being entered in the WMS." *Commonwealth v. Alves*, 2001 WL 1811964, at *5 (Mass.Super. Nov. 23, 2001). Once entered, the information is transferred to the state's criminal justice information system and is then available to all law enforcement agencies via computer. *See* MASS. GEN. L. ch. 276, § 23A. The statute also provides that a printout of the electronic warrant from the system constitutes a true copy of that warrant. *See id.*

10. In 1993, before the statute was enacted, the Massachusetts Appeals Court, addressing a suppression issue in the context of an arrest on an invalid warrant, noted that Massachusetts had not adopted under state law the "good faith" doctrine of *United States v. Leon*, 468 U.S. 897, 906–07, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). *See Hecox*, 619 N.E.2d at 342 n. 6.

court should be drawn into issues that involve the construction of state statutes and of state common law as applied to regulate the personnel actions of a local governmental unit."). Accordingly, the court will decline jurisdiction and thus dismiss Counts II and III without prejudice to Plaintiff's right to pursue those claims in an appropriate state forum. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

### V. CONCLUSION

For the reasons stated, Defendants' motion for summary judgment is allowed in full, with the caveat that Counts II and III are dismissed without prejudice.

IT IS SO ORDERED.